UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2017 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 18 CR00120 AG |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 371: Conspiracy; 18 U.S.C. §§ 1341, 1346: Mail Fraud Involving Deprivation of Honest Services; 18 U.S.C. §§ 1343, 1346: Wire Fraud Involving Deprivation of Honest Services; 18 U.S.C. §§ 1952(a)(1), (a)(3): Use of an Interstate Facility in Aid of Bribery; 42 U.S.C. §§ 1320a-7b(b)(1)(A), (b)(2)(A): Illegal Remunerations for Health Care Referrals; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to be Done; 18 U.S.C. §§ 982(a)(7), 981(a)(1)(A), (a)(1)(C), and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| BRIAN CARRICO, ONE ACCORD MANAGEMENT, INC., and PERFORMANCE MEDICAL & REHAB CENTER, INC., | |
| Defendants. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.   Healthsmart Pacific Inc., doing business as Pacific

Hospital of Long Beach ("Pacific Hospital"), was a hospital located in Long Beach, California, specializing in surgeries, particularly spinal and orthopedic surgeries.  From at least in or around 1997 to October 2013, Pacific Hospital was owned and/or operated by Michael D. Drobot ("Drobot"), along with an unindicted co-conspirator from on or about September 27, 2005 to on or about October 12, 2010.  James Canedo ("Canedo") was Pacific Hospital's Chief Financial Officer ("CFO").

2.    Pacific Specialty Physician Management, Inc. ("PSPM") was a corporation, owned and controlled by Drobot and others and headquartered in Newport Beach, California, that provided administrative and management services for physicians' offices.  PSPM was created to steer patient referrals to Pacific Hospital.  At various times, unindicted co-conspirator ("UCC") A and UCC-B were administrators at PSPM.

3.    Defendant BRIAN CARRICO ("defendant CARRICO") co-owned and/or operated medical clinics in Torrance, Garden Grove, and Riverside, California, which specialized in treating federal employees who sustained work-related injuries covered under a program implemented by the United States Department of Labor ("DOL") (referred to herein as the "FECA program").  These clinics and others were operated as part of the following professional medical corporations: (a) Cooperative Care Medical Group, from at least as early as 2001 to 2004; (b) Performance Health Medical Group, Inc., from 2004 to approximately 2008, and (c) defendant PERFORMANCE MEDICAL & REHAB CENTER, INC. from 2008 to present (collectively, "defendant PERFORMANCE MEDICAL").

4. Defendant ONE ACCORD MANAGEMENT, INC., located at 21707 Hawthorne Blvd., Suite 201, Torrance CA 90503, along with predecessor entities (collectively, "defendant ONE ACCORD"), was the management company for defendant PERFORMANCE MEDICAL and provided non-medical services such as billing, collections, and human resources for defendant PERFORMANCE MEDICAL and its affiliated medical professionals. Defendant CARRICO owned and operated defendant ONE ACCORD.

5. Union Choice Therapy Network, Inc., doing business as Union Choice Medical Provider Network, and related entities, including Union Choice Management Services, Inc. (collectively, "UCTN" or "Union Choice") was the "business development" arm for defendant PERFORMANCE MEDICAL. UCTN was formed to generate or develop patient referrals -- for the exclusive benefit of defendant PERFORMANCE MEDICAL -- through relationships with unions associated with the United States Postal Service and other federal employers with employees who were potentially covered under the FECA program. From at least March 14, 2002, until in or about February 2014, co-conspirator William Parker ("Parker") owned and operated UCTN, along with, starting at least as early as 2005, UCC-C.

6. In practice, regardless of corporate entity distinctions and official ownership status, defendant CARRICO and Parker jointly operated defendants PERFORMANCE MEDICAL and ONE ACCORD from at least as early as 2002 to present. At various times, the wife of defendant CARRICO and sister of Parker, UCC-D, participated in the operation of defendants PERFORMANCE MEDICAL and ONE ACCORD.

7. PHLB MRI, LLC ("PHLB-MRI") provided imaging network services to existing and prospective patients of Pacific Hospital.

1  PHLB-MRI was owned and operated by Drobot and Paul Randall, who was a

2  "marketer" for Pacific Hospital and other entities.  As of August 1,

3  2006, PHLB-MRI contracted with Pacific Hospital for billing and

4  collection services, which Pacific Hospital agreed to provide in

5  exchange for five percent (5%) of PHLB-MRI's net income.  Effective

6  January 1, 2007, PHLB-MRI entered into a "Management Services

7  Agreement" with UCTN that obligated UCTN to provide billing and

8  collection services for PHLB-MRI's FECA program claims, in exchange

9  for thirty percent (30%) of PHLB-MRI's collections.

10      8.    UCC-E was a marketer who solicited defendants PERFORMANCE

11  MEDICAL and ONE ACCORD for patient referrals to Pacific Hospital in

12  or about 2003 or 2004.  After UCC-E was directed to Parker for

13  "business development" on behalf of defendants PERFORMANCE MEDICAL

14  and ONE ACCORD, UCC-E introduced Parker to UCC-A (representing PSPM

15  and Pacific Hospital) to arrange for defendants PERFORMANCE MEDICAL

16  and ONE ACCORD to send patient referrals to Pacific Hospital.

17      9.    Co-conspirator William George Hammer ("Hammer") provided

18  finance, accounting, and operational support for Pacific Hospital,

19  PSPM, and other Drobot-affiliated entities.  Hammer was also the

20  President and CFO of PSPM at various times.

21      10.   UCC-F was responsible for managing Pacific Hospital's

22  overall insurance billings and collections.

23      11.   UCC-G was a business office manager at Pacific Hospital

24  responsible for billing and collecting various insurance claims.

25  Prior to Pacific Hospital entering into a contractual arrangement

26  with UCTN in or around June 2004, UCC-G and her staff were the

27  exclusive billing and collection team for Pacific Hospital's FECA

28  program claims.  Following Pacific Hospital's contractual arrangement

4

with UCTN in or about June 2004, UCC-G and her staff continued to generate FECA program billings, but instead of sending the claims directly to DOL, they sent the billings and accompanying documentation to an employee at defendant ONE ACCORD (who UCC-G believed was an employee of UCTN).

12.   UCC-H was a fiscal manager at Pacific Hospital who interfaced with Parker concerning invoices UCTN sent to Pacific Hospital for payment.   UCC-I was the controller for Pacific Hospital, who would process payment obligations, including invoices from UCTN.

13.   UCC-J was an employee of defendants PERFORMANCE MEDICAL and ONE ACCORD since approximately 1998 and the office manager for defendants PERFORMANCE MEDICAL and ONE ACCORD from November 2003 through approximately May 2011.

14.   UCC-K worked in defendant ONE ACCORD's billing department and was primarily responsible for defendant ONE ACCORD's FECA program collection work for Pacific Hospital until approximately May 2005. UCC-K spent a maximum of two hours per day working on Pacific Hospital collections.

15.   UCC-L was the billing supervisor for defendant ONE ACCORD. Starting in or about 2006, UCC-L took over the supervision and day-to-day handling of defendant ONE ACCORD's billing and collection work for Pacific Hospital.   UCC-L and other defendant ONE ACCORD staff members spent a combined total of a "few hours a week" handling all contracted for FECA program billing and collection work for Pacific Hospital.   UCC-L's primary contact at Pacific Hospital was UCC-G. UCC-L and UCC-G communicated exclusively or almost exclusively over email and telephone.

16.  UCC-M was a human resources, billing, and accounting professional for defendant ONE ACCORD starting in or around November 2004.  UCC-M was responsible for preparing invoices for the "management fee" UCTN paid to defendant ONE ACCORD for billing and collection services UCTN contracted with Pacific Hospital to provide, but which defendant ONE ACCORD, in fact, provided to Pacific Hospital.

17.  UCC-N was the surgical coordinator at defendant PERFORMANCE MEDICAL responsible for scheduling surgeries.

18.  Defendant PERFORMANCE MEDICAL, through defendant ONE ACCORD, provided billing, administrative, and/or facility rental services to various managed "specialty" physicians, including UCC-O, a neurosurgeon; UCC-P, an orthopedic surgeon; and UCC-Q, a podiatrist (collectively, the "Performance Managed Specialty Physicians").

19.  UCC-R was the General Counsel for Pacific Hospital and provided legal support to Pacific Hospital, PSPM, and related entities.  (UCC-A through UCC-R are collectively referred to as "the UCCs".)

20.  Molina Healthcare, Inc. ("Molina Healthcare") was a managed care company headquartered in Long Beach, California.  In or about September 2009, UCC-A left PSPM to join Molina Healthcare's management team.

21.  Pacific Hospital sold its assets to College Hospital of Long Beach ("College Hospital") in or about October 2013.  College Hospital was affiliated with Molina Healthcare, and a Molina executive (the "Molina Executive") was hired to manage College Hospital's operations during the sale transition.  UCC-A introduced the Molina Executive to Parker in or about September 2013 to discuss

a referral relationship involving defendants PERFORMANCE MEDICAL and
ONE ACCORD, UCTN, and College Hospital.

22. Hospital C ("Hospital C") was located in Riverside,
California.  On or about October 1, 2013, defendant CARRICO and
Parker solicited Hospital C's Chief Executive Officer ("Hospital C
CEO") and Vice President of Business Development ("Hospital C VP") to
enter into a referral relationship with defendants PERFORMANCE
MEDICAL and ONE ACCORD and UCTN.

23. Hospital D was a hospital located in Marina Del Rey,
California.  On May 9, 2013, Parker solicited Hospital D's Director
of Spine and Orthopedic Services ("Hospital D Director") to enter
into a referral arrangement with defendants PERFORMANCE MEDICAL and
ONE ACCORD and UCTN.

24. Hospital E was a 49-bed, long term acute care hospital
located in Monrovia, California.  In October 2013, Parker contacted
Hospital E's Chairman of the Board ("Hospital E Chairman") to enter
into a contractual relationships with UCTN.

DOL-OWCP

25. The Federal Employees' Compensation Act, Title 5, United
States Code, Sections 8101, et seq. ("FECA") provided certain
benefits to civilian federal employees, for wage-loss disability due
to a traumatic injury or occupational disease sustained while working
as a federal employee (the "FECA program").  Benefits available to
injured employees included rehabilitation, medical, surgical,
hospital, pharmaceutical, and supplies for treatment of an injury.

26. The Office of Workers' Compensation Programs ("OWCP"), a
component of the Department of Labor ("DOL"), administered the FECA

program, which was a federal workers' compensation program focused on return to work efforts.

27.   When a qualified employee suffered a work-related injury, the employee filed a claim for coverage with OWCP, which then assigned the claimant an OWCP claim number.   Injured employees had the initial choice of physician and could select any enrolled physician and hospital facility to provide necessary treatment.

28.   To obtain reimbursement for services rendered to FECA claimants (i.e., patients or beneficiaries), a provider had to submit its claims for payment to DOL OWCP, using the beneficiary's OWCP claim number.

29.   Billings submitted for medical services required specific forms.   Hospital-based inpatient services were billed on a Uniform Bill (variously designated as an UB-04, CMS-1450, or OWCP-04).   In contrast to hospital bills for FECA beneficiaries, claims for a physician's professional services (e.g., performing a surgery) were submitted for an accepted condition on the standard American Medical Association billing form HCFA-1500, also known as an OWCP-1500.

30.   Billings for the FECA program were submitted by mail to DOL OWCP in London, Kentucky, or electronically through the Electronic Data Interchange.   Affiliated Computer Services ("ACS") contracted with DOL OWCP to facilitate the processing and payment of FECA program claims.   If all required information was included in a claim submission, DOL OWCP approved the billing, through ACS, and sent payment by mail or electronic funds transfer to the provider or hospital in accordance with an established fee schedule.

31.   By submitting a claim for reimbursement to DOL OWCP, the provider certified that the service or product for which

1   reimbursement was sought was medically necessary, appropriate, and
2   properly billed in accordance with accepted industry standards.

3       Health Care Programs

4       32.  The FECA program was a "Federal health care program," as
5   defined by 42 U.S.C. § 1320a-7b(f).

6       33.  The FECA program and other insurance plans were "health
7   care benefit programs," as defined in 18 U.S.C. § 24(b), that
8   affected commerce.

9       34.  The federal anti-kickback statute, 42 U.S.C. § 1320a-
10  7b(b)(1) and (2), prohibited the solicitation or receipt and offering
11  or payment of any remuneration in exchange for the referral of health
12  care patients, services, or items.

13      Relevant California Laws Pertaining to Bribery

14      35.  California law, including but not limited to the California
15  Business and Professions Code and the California Insurance Code
16  prohibited the offering, delivering, soliciting, or receiving of
17  anything of value in return for referring a patient for medical
18  services.

19      36.  California Business & Professions Code Section 650
20  prohibited the offer, delivery, receipt, or acceptance by certain
21  licensees -- specifically including chiropractors and physicians --
22  of any commission or other consideration, whether in the form of
23  money or otherwise, as compensation or inducement for referring
24  patients, clients, or customers to any person.

25      37.  California Insurance Code Section 750(a) prohibited anyone
26  who engaged in the practice of processing, presenting, or negotiating
27  claims, including claims under policies of insurance, from offering,
28  delivering, receiving, or accepting any commission or other

consideration, whether in the form of money or otherwise, as
compensation or inducement to any person for the referral or
procurement of clients, cases, patients, or customers.  Defendant
CARRICO and Parker, through defendants PERFORMANCE MEDICAL and ONE
ACCORD (and purportedly UCTN), were engaged in the practice of
processing, presenting, and negotiating claims covered under the FECA
program and other health care benefit programs.

Fiduciary Duties and the Physician-Patient Relationship

38.  A "fiduciary" obligation generally existed whenever one
person -- a client -- placed special trust and confidence in another
-- the fiduciary -- in reliance that the fiduciary would exercise his
or her discretion and expertise with the utmost honesty and
forthrightness in the interests of the client, such that the client
could relax the care and vigilance which he or she would ordinarily
exercise, and the fiduciary knowingly accepted that special trust and
confidence and thereafter undertook to act on behalf of the client
based on such reliance.

39.  Medical professionals, including physicians and
chiropractors, owed a fiduciary duty to their patients, requiring
them to act in the best interest of their patients, and not for their
own professional, pecuniary, or personal gain.  Medical professionals
owed a duty of honest services to their patients for decisions made
relating to the medical care of those patients, including the
informed choice of whether to undergo surgery and other medical
procedures, as well as the selection of a provider and facility for
such surgeries and procedures.  Patients' right to honest services
from medical professionals included the right not have these
fiduciaries solicit, offer, or accept kickbacks and bribes connected

1  to the medical care of such patients.

2  B.   OBJECTS OF THE CONSPIRACY

3       40.   Beginning on a date unknown, but at least as early as June

4  2004, and continuing through at least December 2013, in Los Angeles,

5  Orange, and Riverside Counties, within the Central District of

6  California, and elsewhere, defendant CARRICO, Parker, joined by

7  defendant PERFORMANCE MEDICAL from no later than 2008 to at least in

8  or about December 2013, defendant ONE ACCORD from no later than 2004

9  to at least in or about December 2013, along with Drobot, Canedo,

10  Hammer, the UCCs, and others known and unknown to the Grand Jury at

11  various times between 2004 and 2013, inclusive, knowingly combined,

12  conspired, and agreed to commit the following offenses against the

13  United States:

14       a.   Honest Services Mail and Wire Fraud, in violation of

15  Title 18, United States Code, Sections 1341, 1343, and 1346;

16       b.   Mail and Wire Fraud, in violation of Title 18, United

17  States Code, Sections 1341 and 1343;

18       c.   Concealment Money Laundering, in violation of Title

19  18, United States Code, Section 1956(a)(1)(B)(i);

20       d.   Monetary Transactions in Property Derived from

21  Specified Unlawful Activity, in violation of Title 18, United States

22  Code, Section 1957;

23       e.   Knowingly and willfully soliciting and receiving

24  remuneration in return for referring an individual to a person for

25  the furnishing or arranging for the furnishing of any item or service

26  for which payment may be made in whole or in part under a Federal

27  health care program, in violation of Title 42, United States Code,

28  Section 1320a-7b(b)(1)(A); and

1        f.    Knowingly and willfully offering to pay and paying any

2    remuneration to any person to induce such person to refer an

3    individual to a person for the furnishing or arranging for the

4    furnishing of any item or service for which payment may be made

5    in whole or in part under a Federal health care program, in violation

6    of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

7    C.   MANNER AND MEANS OF THE CONSPIRACY

8        41.   The objects of the conspiracy were to be carried out, and

9    were carried out, in the following ways, among others:

10        a.    Parker, through UCTN, and others would develop

11   relationships and interface with unions associated with the United

12   States Postal Service and other federal employers to obtain referrals

13   of employees who were injured on the job and potentially covered

14   under the FECA program.

15        b.    As a result of Parker's efforts to generate patient

16   referrals, federal employees with potentially covered injuries would

17   be steered to defendant PERFORMANCE MEDICAL, through UCTN, for

18   medical treatment.

19        c.    These referred patients would receive medical

20   treatment at defendant PERFORMANCE MEDICAL.   A number of these

21   patients would be further referred to a hospital for spinal

22   surgeries, other types of surgeries, magnetic resonance imaging

23   ("MRI"), pain management, and other services, to be paid through the

24   FECA program and other insurance plans.

25        d.    Defendant CARRICO and Parker would solicit various

26   hospitals, including Pacific Hospital, College Hospital, Hospital C,

27   Hospital D, and Hospital E (collectively, the "Kickback Solicited

28   Hospitals"), to engage in an illegal kickback relationship such that

1  defendants PERFORMANCE MEDICAL and ONE ACCORD would refer patients

2  covered under the FECA program and other insurance plans to a

3  Kickback Solicited Hospital if the Kickback Solicited Hospital agreed

4  to pay kickbacks and bribes to defendant CARRICO and Parker.

5          e.    The kickback and bribe relationship with the Kickback

6  Solicited Hospitals would be facilitated and disguised by defendant

7  CARRICO and Parker through a series of intermediate relationships

8  involving: (1) the Kickback Solicited Hospitals and UCTN; (2)

9  defendant CARRICO and Parker on the one hand, and defendants

10 PERFORMANCE MEDICAL and ONE ACCORD and UCTN on the other hand; (3)

11 defendants PERFORMANCE MEDICAL and ONE ACCORD and the Performance

12 Managed Specialty Physicians; and (4) the Performance Managed

13 Specialty Physicians and the Kickback Solicited Hospitals.

14          Defendant CARRICO and Parker's Relationship

15            with the Kickback Solicited Hospitals

16          f.    Parker, in coordination with defendant CARRICO, would

17 approach a Kickback Solicited Hospital through a "marketer"

18 affiliated with the hospital and/or through direct contact with one

19 or more executives at the hospital.  Defendant CARRICO would

20 occasionally accompany Parker to the "pitch" or solicitation meeting

21 with the hospital.

22          g.    During the "pitch" or solicitation meeting, Parker

23 and, if present, defendant CARRICO, would generally present a

24 "package deal" or "program" to a Kickback Solicited Hospital,

25 designed and intended to induce a Kickback Solicited Hospital to pay

26 kickbacks and bribes for the referral of patients of defendant

27 PERFORMANCE MEDICAL.

28          h.    The "package deal" or "program" pitched to a Kickback

Solicited Hospital would generally entail and highlight:

    i.   The nature of defendant CARRICO's familial (brother-in-law) relationship with Parker;

    ii.  defendant CARRICO's ownership and/or operation of clinics in Southern California (i.e., defendant PERFORMANCE MEDICAL clinics);

    iii. Arrangements UCTN or defendants PERFORMANCE MEDICAL and ONE ACCORD had with the United States Postal Service purportedly facilitating the referral of injured postal employees to defendant PERFORMANCE MEDICAL (i.e., a captive patient base);

    iv.  As part of the treatment of injured federal employees at the defendant PERFORMANCE MEDICAL clinics, the need for patients to undergo surgeries and other medical procedures at a hospital (i.e., a significant surgical referral source for the Kickback Solicited Hospital);

    v.   Defendant CARRICO and Parker's control over patient referrals and desire to have surgeries and other financially lucrative medical procedures covered under the FECA program performed at a Kickback Solicited Hospital; and

    vi.  UCTN's experience with the FECA program that would facilitate the referral of patients with pre-approved surgery authorizations to the Kickback Solicited Hospital (despite the fact that the physician-provider, rather than the hospital facility, was required to obtain a surgical authorization from DOL OWCP).

    i.   In exchange for the Kickback Solicited Hospital entering into a contractual agreement with UCTN, and the associated payment or fee specified in such contract, defendant CARRICO and Parker, through defendants PERFORMANCE MEDICAL and ONE ACCORD, would

refer or cause the referral of patients to the Kickback Solicited
Hospital for surgeries and other medical services.

> j.   The referral arrangement between defendant CARRICO and
Parker, on the one hand, and the Kickback Solicited Hospital, on the
other hand, would be disguised or concealed in one or more written
agreements, including a purported "Management Services Agreement"
between UCTN and the Kickback Solicited Hospital.

> k.   The Management Services Agreements ("MSAs") would
purport to require UCTN to assist a Kickback Solicited Hospital with
billing and collection services for FECA program claims.

> l.   The MSAs would generally:

> > i.   Provide that UCTN shall "at its expense, provide
clerical, managerial, and administrative personnel" to perform
billing and collection services for a Kickback Solicited Hospital's
FECA program claims;

> > ii.   With respect to the billing services:

> > > (1)   Prior to 2012, the MSAs would falsely state
that UCTN would "bill" for all patients covered under the FECA
program and treated at the Kickback Solicited Hospital, while, in
reality, the Kickback Solicited Hospital would generate all of its
own FECA program billings and forward them to defendant ONE ACCORD
for review; or

> > > (2)   From 2012 onwards, the MSAs would state that
UCTN would not generate any billings for the Kickback Solicited
Hospital, such that the hospital, through its billing department,
would still absorb the cost of billing for insurance reimbursement,
which UCTN would "review";

> > > iii. Falsely represent that all personnel performing

billing and collection services under the MSAs were UCTN employees,
when, in reality, UCTN was effectively a "marketing" or "business
development" arm of defendants PERFORMANCE MEDICAL and ONE ACCORD,
which would pay defendant ONE ACCORD to perform all billing and
collection services for the Kickback Solicited Hospital;

    iv. In an attempt to justify the purported billing
and collection fee specified in the MSAs, identify redundant services
with nominal or no value-added benefit to the Kickback Solicited
Hospital, which would already have a fully functioning billing and
collection department rendering the same general services.  For
example, UCTN would be designated as having the sole responsibility
for "collecting" on the Kickback Solicited Hospital's FECA program
claims, when, in reality, a Kickback Solicited Hospital, such as
Pacific Hospital or Hospital C, would have existing billing and
collection departments covering all relevant health care benefit
programs.  Moreover, FECA program payments on pre-authorized
surgeries was virtually automatic, and required de minimis
"collection" effort compared to certain other health care benefit
programs; and

    v. Require the Kickback Solicited Hospital to pay an
exorbitant fee far exceeding the fair market value of any billing,
collection, or any other legitimate benefit -- unrelated to a patient
referral -- UCTN would provide, or would purport to provide, to the
Kickback Solicited Hospital.  While the fee specified in the MSAs
varied over time -- ranging from a percentage (e.g., 30%) of the
hospital's collections on FECA program claims to fixed monthly fees
(e.g., $55,000; $75,000; $30,000) -- defendant CARRICO and Parker
established and understood the fee to be an inducement and

compensation, in whole or part, for the referral of patients from defendant PERFORMANCE MEDICAL to the Kickback Solicited Hospital.

### Relationship Between Defendant CARRICO and Parker, UCTN, and defendants PERFORMANCE MEDICAL and ONE ACCORD

m.   To create and maintain a false appearance of separation between defendants PERFORMANCE MEDICAL and ONE ACCORD (a referral source) and a Kickback Solicited Hospital (a kickback payer), defendant CARRICO and Parker would require that a Kickback Solicited Hospital enter into a contractual relationship with Parker, through UCTN, to conceal and disguise the nature, ownership, and control of payments from the Kickback Solicited Hospital, which would be made to induce the referral of patients of defendant PERFORMANCE MEDICAL.

n.   Shortly after a Kickback Solicited Hospital would make a kickback payment to UCTN under the guise of a contractual relationship for billing and collection services, UCTN would conduct an additional financial transaction to share a portion of the kickback tainted proceeds with defendant CARRICO.  Defendant CARRICO and Parker would devise various arrangements for the transfer of such proceeds from UCTN to defendant ONE ACCORD.

o.   These arrangements would require UCTN to compensate defendant ONE ACCORD to perform all of the billing and collection services UCTN obligated itself to provide a Kickback Solicited Hospital under the management services agreements.

p.   The payments under these functionally internal agreements between UCTN and defendant ONE ACCORD would be for varying amounts over time that would, in practice, be calculated, at least through 2011, as a percentage of the amount of kickback and bribe

proceeds UCTN would receive from a Kickback Solicited Hospital.   The distribution of these tainted proceeds from UCTN to defendant ONE ACCORD would occasionally involve financial transactions exceeding $10,000.

q.   Despite the fact that defendant ONE ACCORD would perform all of the billing and collection services called for under the management services agreements, UCTN would only be required to share a small fraction of the amount it would receive from a Kickback Solicited Hospital with defendant ONE ACCORD.

r.   Defendant CARRICO would be aware of the monthly kickback and bribe proceeds a Kickback Solicited Hospital would pay to Parker, through UCTN.

s.   Parker would retain the vast majority of the kickback and bribe tainted proceeds from a Kickback Solicited Hospital as remuneration for Parker steering FECA program patients from unions and other sources to defendant PERFORMANCE MEDICAL, which, at the direction and control of defendant CARRICO and Parker, would refer these patients, through the Performance Managed Specialty Physicians, to a Kickback Solicited Hospital.

t.   The foregoing indirect kickback and bribe arrangement would allow defendant CARRICO and Parker to avoid law enforcement scrutiny as defendant CARRICO, who officially owned and/or operated defendants PERFORMANCE MEDICAL and ONE ACCORD, would not make any direct payments to UCTN, an entity which steered patient referrals to defendant PERFORMANCE MEDICAL.   More specifically, prior to June 2004, defendant CARRICO would cause defendants PERFORMANCE MEDICAL and ONE ACCORD to directly pay Parker, through UCTN, a percentage of defendant PERFORMANCE MEDICAL's collections on FECA program patients

that UCTN steered to defendant PERFORMANCE MEDICAL.  After UCTN

entered into an MSA with Pacific Hospital, UCTN would no longer

receive any payments from defendant PERFORMANCE MEDICAL.  Instead,

UCTN would obtain kickback and bribe proceeds from a Kickback

Solicited Hospital disguised under a Management Services Agreement as

billing and collection fees, and then UCTN would pay defendant ONE

ACCORD a small and varying portion of such fee (e.g., 5% to 6%, or,

later, a comparable fixed monthly amount).  Put differently,

defendant ONE ACCORD would perform all of the billing and collection

services (which UCTN would purport to do in the applicable MSA) for a

small fraction of the total kickback and bribe proceeds a Kickback

Solicited Hospital would pay to UCTN.  Defendant CARRICO would allow

Parker to retain the remaining amount (approximately 95%) of the

kickback proceeds from a Kickback Solicited Hospital in exchange for

Parker steering FECA program patients to defendant PERFORMANCE

MEDICAL.

        u.    Defendant CARRICO and Parker understood that their

payment arrangements, purporting to flow from outwardly arms-length

relationships between a Kickback Solicited Hospital and UCTN on the

one hand, and UCTN and defendant ONE ACCORD on the other hand, would

be used to distribute kickback and bribe proceeds from Kickback

Solicited Hospitals, and to induce Parker to steer federal employee-

patients to defendant PERFORMANCE MEDICAL, which, in turn, would bill

substantial amounts to the FECA program for treating these patients,

and further refer such patients to a Kickback Solicited Hospital to

sustain the overall referral arrangements.

        v.    Defendant CARRICO would also benefit from the referral

arrangements as, based on the payments Parker would receive from a

Kickback Solicited Hospital, defendants CARRICO, PERFORMANCE MEDICAL, and ONE ACCORD would not otherwise compensate Parker for his work co-managing and operating defendants PERFORMANCE MEDICAL and ONE ACCORD.

Relationship Between Defendants PERFORMANCE MEDICAL and ONE ACCORD
and the Performance Managed Specialty Physicians

w.    To facilitate referral arrangements with Kickback Solicited Hospitals that would pay kickbacks and bribes for patient referrals, defendant CARRICO and Parker would cause defendant ONE ACCORD to negotiate various agreements with the Performance Managed Specialty Physicians.

x.    These agreements would include a "Management Agreement" and a "Facility Rental and Services Agreement" that would be entered into between defendant ONE ACCORD, through defendant CARRICO, and the individual Performance Managed Specialty Physicians, including UCC-O, UCC-P, and UCC-Q.

y.    As a central, but unwritten, part of the arrangement with the Performance Managed Specialty Physicians, defendant CARRICO and Parker would exercise control over where the Performance Managed Specialty Physicians performed hospital-based surgeries and medical procedures on patients of defendant PERFORMANCE MEDICAL.

z.    To facilitate a referral arrangement with a Kickback Solicited Hospital that defendant CARRICO and Parker anticipated would enter into a contractual agreement with UCTN, defendant CARRICO and Parker would also instruct the Performance Managed Specialty Physicians to obtain hospital privileges (to the extent the Performance Managed Specialty Physicians did not already have such privileges) and perform surgeries and other medical procedures at such hospital.

## Relationship Between the Performance Managed
## Specialty Physicians and Pacific Hospital

aa.   Any Kickback Solicited Hospital that would, in fact, enter into a referral arrangement with defendant CARRICO and Parker would have or develop a relationship with one or more of the Performance Managed Specialty Physicians to further facilitate patient referrals from defendant PERFORMANCE MEDICAL.

bb.   At least one Kickback Solicited Hospital -- Pacific Hospital -- would, in fact, enter into a kickback relationship with defendant CARRICO and Parker, nominally through UCTN, to obtain patient referrals from defendant PERFORMANCE MEDICAL.

cc.   Drobot, UCC-A, and other co-conspirators would initially introduce several of the Performance Managed Specialty Physicians, including UCC-O and UCC-P, to defendant CARRICO and Parker for placement within defendants PERFORMANCE MEDICAL and ONE ACCORD (i.e., to become Performance Managed Specialty Physicians).

dd.   To further facilitate the referral of patients from defendant PERFORMANCE MEDICAL to Pacific Hospital, Drobot and other co-conspirators, through PSPM and related-entities, would develop relationships with several of the Performance Managed Specialty Physicians, specifically including UCC-O. Defendant CARRICO and Parker would have knowledge of, encourage, or facilitate relationships between Drobot and the Performance Managed Specialty Physicians.

## Other Aspects of the Relationship Among Defendant CARRICO, Parker,
## and the Kickback Solicited Hospitals

ee.   Medical professionals who were responsible for treating or otherwise rendering care to patients of any Kickback

Solicited Hospital and defendant PERFORMANCE MEDICAL, including defendant CARRICO and the Performance Managed Specialty Physicians, owed a duty of honest services to those patients for decisions made relating to medical care and treatment, including the informed choice of whether to undergo surgery and other medical procedures, as well as the choice of a treatment provider and facility for such surgeries and procedures.  The fact that defendant CARRICO and Parker would solicit or receive inducements to direct, instruct, and cause the Performance Managed Specialty Physicians and other medical professionals responsible for the care of patients of defendant PERFORMANCE MEDICAL to refer such patients to a Kickback Solicited Hospital for surgeries and other medical services would deprive the patients of their right to honest services and would be material to these patients who were referred to a Kickback Solicited Hospital after treatment at defendant PERFORMANCE MEDICAL.

ff.  By mail and electronically, a Kickback Solicited Hospital, the Performance Managed Specialty Physicians, and defendant PERFORMANCE MEDICAL would process, finalize, and formally submit claims to DOL OWCP and other health care benefit programs: (1) for, with respect to the hospital, payment of the facility fee and related hospital costs; (2) related to the Performance Managed Specialty Physicians, for payment of professional fees associated with surgeries and other medical procedures performed at the Kickback Solicited Hospital; and (3) with respect to defendant PERFORMANCE MEDICAL, for patient visits, therapy sessions, durable medical equipment, and other items or services rendered at the defendant PERFORMANCE MEDICAL clinics.

gg.  As defendant CARRICO and Parker and other co-conspirators knew and intended, and as was reasonably foreseeable to them, in using the mails, wire communications, and other facilities in interstate commerce to treat patients, communicate regarding patient referrals and kickback payments, and submit claims for payment, Drobot, defendant CARRICO, and Parker, and other co-conspirators solicited, offered, received, and paid kickbacks that were material to patients and health care benefit programs.

hh.  The FECA program and other health care benefit programs would routinely wire or mail funds from outside of California as payment on claim submissions from defendant PERFORMANCE MEDICAL, the Performance Managed Specialty Physicians, and Kickback Solicited Hospitals.

ii.  Any Kickback Solicited Hospital that would, in fact, enter into a referral arrangement, would provide remuneration to defendant CARRICO and Parker, through UCTN, by mail and other means.

jj.  Defendant CARRICO and Parker would cause co-conspirators to keep records of the number of surgeries and certain other medical services performed at a Kickback Solicited Hospital that involved patients referred from defendant PERFORMANCE MEDICAL and covered under the FECA program, as well as the remuneration that would be provided to defendant CARRICO and Parker in connection with those referrals.

D.  EFFECTS OF THE CONSPIRACY

42.  Had the FECA program and other health care benefit programs known the true facts regarding the payment of kickbacks and bribes for the referral of patients for surgeries and other medical services performed at Pacific Hospital, they would have subjected the claims

23

to additional review, would not have paid the claims, and/or would have paid a lesser amount on the claims.

43.   Between June 2004 and December 2013, Pacific Hospital submitted over $45 million in claims to DOL-OWCP under the FECA program for surgeries, treatments, and other services for patients that defendant CARRICO and Parker referred, or caused the referral of, to Pacific Hospital.  This included approximately $34 million in such claims between September 2009 and December 2013.

44.   Based on those claims, Pacific Hospital was paid over $23 million in reimbursements from the FECA program between June 2004 and December 2013, including approximately $16 million in payments between September 2009 and December 2013.  In turn, Pacific Hospital remunerated defendant CARRICO and Parker, through UCTN, approximately $5,250,000, primarily for the corresponding patient referrals covered under the FECA program.  UCTN further distributed approximately $800,000 of this amount to defendant ONE ACCORD for performing the billing and collection services in connection with Pacific Hospital.

45.   Independent and apart from Pacific Hospital's claims for reimbursement, between June 2004 and December 2013, defendant CARRICO and Parker caused defendants PERFORMANCE MEDICAL and ONE ACCORD to bill the FECA program, on behalf of defendant PERFORMANCE MEDICAL and the Performance Managed Specialty Physicians, approximately $35 million for the treatment and care of patients of defendant PERFORMANCE MEDICAL, who were referred to Pacific Hospital for surgeries, treatments, and other services.  This included approximately $19 million in such claims between September 2009 and December 2013.

24

46.  Based on the claims submitted by defendants PERFORMANCE MEDICAL and ONE ACCORD, defendant PERFORMANCE MEDICAL and the Performance Managed Specialty Physicians were paid over $33 million in reimbursements from the FECA program between June 2004 and December 2013, including approximately $18 million in payments between September 2009 and December 2013.

47.  In total, Pacific Hospital and defendants PERFORMANCE MEDICAL and ONE ACCORD submitted approximately $83 million in claims to DOL-OWCP under the FECA program and were paid approximately $57 million in connection with the referral of patients of defendant PERFORMANCE MEDICAL, which defendant CARRICO and Parker controlled, facilitated, or caused to go to Pacific Hospital.

E.  OVERT ACTS

48.  On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants CARRICO, PERFORMANCE MEDICAL, and ONE ACCORD, along with Parker, the UCCs, and other co-conspirators known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:    In early 2004, UCC-E solicited defendant PERFORMANCE MEDICAL for patient referrals in connection with "marketing" for Pacific Hospital.  After UCC-E was directed to Parker for "business development" on behalf of defendants PERFORMANCE MEDICAL and ONE ACCORD, UCC-E introduced Parker to UCC-A (representing Pacific Hospital and PSPM) for the purpose of arranging for defendant PERFORMANCE MEDICAL to send patient referrals to Pacific Hospital.

Overt Act No. 2:    On or about March 19, 2004, defendant CARRICO caused the Medical Board of California to issue a fictitious name permit to Performance Health Medical Group, Inc., located at 21707 Hawthorne Boulevard in Torrance, California.  (In December 2003, defendant CARRICO caused the submission of the application underlying the fictitious name permit, which listed defendant CARRICO as the 49% owner of Performance Health Medical Group, Inc.)

Overt Act No. 3:    On or about May 20, 2004, UCC-A emailed UCC-F, copying Drobot and UCC-E, writing:

> Per Mr. Drobot we have entered into an agreement with Union Choice Therapy Network to bill and collect on the Federal postal workers.  [UCC-E] will be contacting you regarding setting up a meeting with [Parker].  Mr. Drobot has requested that he also re-bill all outstanding claims.  Thank you.

Overt Act No. 4:    As part of the email chain identified in the preceding Overt Act, UCC-E emailed UCC-F on or about May 28, 2004, writing, in part, "[I] am sending you the listing of patients that I have referenced in the past for Federal work. . ."  UCC-E then listed several doctors, including defendant CARRICO, that were associated with defendants PERFORMANCE MEDICAL and ONE ACCORD.  UCC-E further wrote, "There were not as many as were mentioned yesterday. I think the total was approx. 125 patient[s] from 2002 to present. . ."

Overt Act No. 5:    On a date unknown, UCTN entered into a "Management Services Agreement" with Pacific Hospital, effective June 1, 2004.

Overt Act No. 6:    As of December 14, 2004, Parker possessed at least two Microsoft Word documents on his Dell laptop computer located at defendants PERFORMANCE MEDICAL and ONE ACCORD appearing to

1  be written contracts involving Pacific Hospital: one unsigned draft

2  "Marketing Services Agreement" and another "Management Services

3  Agreement."   The contents of both these documents involved UCTN

4  rendering services to Pacific Hospital.   Parker's Dell laptop also

5  had blank "boiler plate" or template versions of both these

6  agreements (i.e., the marketing and management agreements) that did

7  not identify a specific contracting party other than UCTN.

8      Overt Act No. 7:   On or about May 17, 2005, Hammer emailed

9  UCC-I with the subject, "Union Choice Billing," with a spreadsheet

10 titled "Union choice Reconcil[i]ation.xls."  The body of the email

11 referenced a "schedule of the Union Choice and One Accord balances

12 due."  The attached schedule identified amounts defendant ONE ACCORD

13 owed PSPM for rent and related expenses at a Sherman Oaks office, and

14 amounts Pacific Hospital owed UCTN based on specifically identified

15 monthly collection invoices.

16     Overt Act No. 8:   On or about August 15, 2005, a

17 representative of defendants PERFORMANCE MEDICAL and ONE ACCORD

18 emailed Parker regarding "PHLB CORRECTED TOTALS," and inquired

19 whether she should account for two patients that Pacific Hospital

20 provided in a list of payments that Pacific Hospital had received

21 from DOL OWCP, but who were not patients of defendant PERFORMANCE

22 MEDICAL.  Parker responded: "We are interested in only the patients

23 that we manage, bill, and collected for.  So other patients and

24 collections we are still discussing if we can help them."

25     Overt Act No. 9:   On or about November 16 and 17, 2005, Parker

26 emailed UCC-H writing that he (Parker) had been "asked to collect any

27 of the Federal OWCP outstanding AR" for Pacific Hospital and

28 requested a listing of the outstanding FECA program accounts

receivables. UCC-H responded: "Don't you already have the accounts that you are working on?" Parker replied:

> Yes for the doctors that we are managing. [But] I'm referring to all or any other federal work-comp outstanding accounts receivable. You can include all of the doctors that we manage as well, because you will have a complete comprehensive list.

Overt Act No. 10: On or about March 14, 2006, Parker emailed UCC-A and thanked her for introducing "us" to UCC-O. Parker further discussed surgeries that were canceled by another spine surgeon at defendants PERFORMANCE MEDICAL and ONE ACCORD and the number of surgeries that are scheduled at Pacific Hospital, "two Low Back surgeries scheduled and at least 4 other extremity surgeries as well!" Parker continued, "We are hopping [sic] that [UCC-O] will be the solution." Parker then asked if UCC-A could ask UCC-H to expedite several invoices.

Overt Act No. 11: On or about November 2, 2006, Parker emailed an employee of Pacific Hospital, copied UCC-J, and wrote:

> Please review the enclosed list of Federal patients that have received surgeries/procedures at the Pain Center performed by [UCC-Q] and [another doctor associated with defendants PERFORMANCE MEDICAL and ONE ACCORD]. The payor is the Department Of Labor, Office of Workers Compensation Programs (OWCP). Union Choice Therapy Network is contracted with Pacific Hospital for billing, collection and management of these patients. We manage doctors[:] [UCC-Q], [UCC-O], [and several other doctors associated with defendants PERFORMANCE MEDICAL and ONE ACCORD] . . .

1        <u>Overt Act No. 12:</u>   On or about February 13, 2007, UCC-H emailed

2    Parker inquiring about two collection invoices from Union Choice sent

3    to Pacific Hospital.   One invoice (#1039) specified a 30% collection

4    fee and the second invoice (#1041) specified a 20% collection fee.

5    UCC-H asked whether the 20% collection fee cited in invoice #1041 was

6    an error.   Parker responded: "Regarding #1041, that Invoice is paid

7    under the new Agreement for all Non-Managed patients [referring to

8    patients that were not treated at defendant PERFORMANCE MEDICAL] at

9    20% of collection."

10       <u>Overt Act No. 13:</u>   On or about October 26, 2007, Parker,

11   through UCTN, entered into a "Management Services Agreement" with

12   PHLB-MRI that obligated UCTN to provide billing and collection

13   services limited to PHLB-MRI's FECA program claims, in exchange for

14   thirty percent (30%) of PHLB-MRI's collections.   The contract

15   identified a January 1, 2007 effective date.

16       <u>Overt Act No. 14:</u>   On or about November 16, 2007, Canedo

17   emailed various Pacific Hospital and PSPM executives and employees an

18   executed copy of the "Management Services Agreement" PHLB-MRI entered

19   into with UCTN, effective January 1, 2007.

20       <u>Overt Act No. 15:</u>   On or about November 2, 2007, defendant

21   CARRICO caused defendant ONE ACCORD to deposit a $13,541.94 check

22   from Parker, through UCTN, which represented a portion of the amount

23   Pacific Hospital paid UCTN related to the hospital's FECA program

24   collections in May 2007 and June 2007.

25       <u>Overt Act No. 16:</u>   On or about December 19, 2007, UCC-J emailed

26   Parker, with the subject, "SPINE REFERRALS," writing: "Here is the

27   number of spine referrals to the orthos over the past 6 months. I

28   went back through all of the final schedules since June and here is

29

1  what is showed[.]"  The email then identified two Performance Managed

2  Specialty Physicians and the number of spinal surgeries they

3  performed during the relevant period.

4      Overt Act No. 17:  On or about November 5, 2007, UCC-M sent

5  defendant CARRICO an email with the subject "UCTN- History of Pmts,"

6  attaching the spreadsheet "UCTN Payments110507.xls," which reflected

7  payments UCTN made to defendant ONE ACCORD between January 2006 and

8  November 2007, along with the date of deposit, purpose of the payment

9  (often simply referencing specific months (e.g. "Oct'05" or

10  "Feb/Mar'07")), and the amount of each payment.

11      Overt Act No. 18:  On or about February 16, 2008, defendant

12  CARRICO emailed UCC-M inquiring: "Have you emailed [Parker] the new

13  re[m]u[n]eration letter?  Did you /cc [UCC-D]?"

14      Overt Act No. 19:  On or about February 16, 2008, UCC-M emailed

15  Parker, copying defendant CARRICO and UCC-D, with the subject

16  "Payroll compensation adjustment."  In part, the email highlighted

17  that, other than for purposes of receiving health insurance, Parker

18  was not a bona fide employee of, and was not otherwise compensated

19  by, defendants ONE ACCORD or PERFORMANCE MEDICAL for any services he

20  rendered to these entities.  UCC-M wrote, in relevant part:

21      William, In order to keep you and your family on health

22      insurance, we must have you work the equivalent of 32 hours per

23      week at $8.25 per hour.  At 26 pay periods per year that is

24      equal to $1,144.00 per month.  Each check will be a gross amount

25      of $528.00 per pay period.  Your insurance benefits total

26      $482.50 per pay period and are "pre tax".  Please plan

27      accordingly as this will be effective 2/11/07 and reflect on

28      your paycheck dated 2/29/08.  We will make [UCC-C]'s date of

30

1   "resignation" effective 2/8/08, so she will not receive a

2   paycheck on the 29th.   . . .

3   Regarding the cost for billing services to Pacific Hospital,

4   ([UCC-L], [UCC-J], Barbara, Etc.), I am told the figure is

5   $3,000 per month.  Therefore, you will need to reimburse One

6   Accord Management $4,144.00 per month in addition to 20% of your

7   30% collections.  Please send us a check fo[r] $4111.00 on the

8   12th of each month. In addition, could we get an accurate

9   account of the outstanding payments from Pacific Hospital and

10  their plan for repayment.

11  1,144.00  Monthly 'Salary'

12  3,000.00  Cost for billing services

13  4,144.00

14  + 20% Collections    . . .

15  Overt Act No. 20:   On or about March 11, 2008, defendant

16 CARRICO emailed Parker, with the subject "$3000 ancillary costs,"

17 writing:

18  Hi Willy, Regarding the costs of [UCC-J], etc., to assist in the

19  surgical procedures, I am willing to split the cost with you.

20  That would mean $1500 each.  Let me know what you decide.

21 Parker responded to defendant CARRICO, "OK", and added UCC-M to the

22 email chain.  UCC-M then responded to defendant CARRICO only,

23 removing Parker from the email chain and wrote:

24  Dr. C, So then the total cost per month will be:

25  1144.00 - Payroll reimbursement

26  1500.00 - Collection services

27  3644.00 [math error in original, should read 2644.00]

28  + 20%   on collections

31

1    Please confirm.

2    Overt Act No. 21:   On or about July 15, 2008, UCC-H emailed

3    Parker a "New MRI Ownership Agreement" between Drobot and Paul

4    Randall concerning the ownership status of PHLB-MRI.   UCC-H further

5    directed Parker to resubmit outstanding MRI invoices per the

6    agreement.   Parker then emailed UCC-A for clarification regarding re-

7    billing.   After a number of additional emails, UCC-H advised Parker

8    that if he billed "The Ninth Hole, LLC," Pacific Hospital would pay

9    the invoice and collect the payment from Paul Randall.

10   Overt Act No. 22:   On or about August 7, 2008, Canedo emailed

11   UCC-H and others attaching 13 different invoices from UCTN related to

12   MRI collections noting that "All of these prior [UCTN] invoices will

13   be paid by PHLB and withheld from Paul Randall's money."

14   Overt Act No. 23:   Between January 7 and January 9, 2009,

15   defendant CARRICO, Parker, UCC-C, UCC-D, and UCC-M were part of an

16   email chain concerning the accounting of payments from UCTN to

17   defendant ONE ACCORD related to billing and collection services

18   rendered to Pacific Hospital.   In part of the email chain, on or

19   about January 8, 2009, UCC-C wrote the following to UCC-M:

20       "[UCC-M], What is becoming difficult about this is you are

21       expecting different and additional information from what I

22       originally offered to send to Dr Carrico.   When I spoke to him I

23       said I would send an accounting of everything that was paid in

24       2008.   I believe I was very specific regarding all the

25       information I sent you.   Which was only 2 pages and included all

26       the check numbers and Invoices that were paid and what's

27       outstanding in 2008 as well as the Payroll reimbursement paid to

28       [UCC-L].

. . .

> Regarding Outstanding 2007 Invoices-Please see the attached
> Invoices that represent Ancillary Services that were included in
> the original Contract with PHLB [Pacific Hospital].  Sometime in
> 2007 we had to re-bill them to separate companies that purchased
> the accounts receivable from PHLB[.]

Overt Act No. 24:  On or about January 9, 2009, as part of the email chain identified in the preceding Overt Act, UCC-C further replied:

> We were paying $1 an hour for [UCC-L] in 2007 until we started
> paying the $1500 a month.  When [UCC-L] requested a raise or
> bonus in 2008 for collecting Pacific [Hospital] we agreed to pay
> for the raise which took [e]ffect March 2008.  Thanks. [UCC-C]

Overt Act No. 25:   On or about January 9, 2009, defendant CARRICO emailed UCC-C writing:

> Hi [UCC-C], When we met in December, I gave you the figures I
> had for 2007 and 2008.  Please provide Chris with the figures
> for 2007, so we can understand the discrepancies[.]

Overt Act No. 26:  On or about January 28, 2009, in preparation for Parker to speak with UCC-A, UCC-J and Parker emailed each other concerning MRI statistics for patients of defendant PERFORMANCE MEDICAL at Pacific Hospital and PHLB-MRI.

Overt Act No. 27:   On or about February 11, 2009, UCC-J emailed another employee of defendants PERFORMANCE MEDICAL and ONE ACCORD indicating that UCC-J may be moved out of her then-current office space to accommodate Parker, who, according to "Dr. C", was "going to be getting back involved in managing."

Overt Act No. 28:   On or about February 27, 2009, UCC-H emailed Parker with the following:

> Hi William, I believe I asked [you] [this] before but I can't remember.  On your invoices, why is the collection percentage that we pay you sometimes 30% and sometimes 20%?

Parker responded:

> Hi Howard, We have a collection only contract with PHLB for patients that we just collect on and don't also perform management services[:] 1) Authorize Surgery, 2) Schedule Patient, etc.  William.

Overt Act No. 29:   On or about April 8, 2009, Hammer spoke to Parker over the telephone to negotiate a settlement of approximately $450,000 in outstanding payments owed to UCTN under the guise of the MSA between Pacific Hospital and UCTN.  In connection with negotiating the settlement amount, Parker argued for no reduction of the outstanding amount based on "how difficult and expensive it was to generate the business."

Overt Act No. 30:   On or about April 18, 2009, Parker and Drobot entered into and executed a "Settlement Agreement and General Mutual Release."  The settlement agreement (a) negotiated down the outstanding sum of $504,354 owed to UCTN under the guise of the MSA between Pacific Hospital and UCTN to $252,177 and (b) amended the management fee under the MSA from 30% of collections down to 25%.

Overt Act No. 31:   On or about August 14, 2009, UCC-N emailed Parker and UCC-J, advising that Pacific Hospital requires that a medical doctor on staff at Pacific Hospital must perform the pre-operation ("pre-op") history and physical examination on patients scheduled for surgery at Pacific Hospital.

34

Overt Act No. 32:   On or about August 16, 2009, as part of the email chain identified in the preceding Overt Act, Parker emailed UCC-A about obtaining privileges for a defendant PERFORMANCE MEDICAL doctor who would ultimately do pre-op exams for patients of defendant PERFORMANCE MEDICAL with operations scheduled at Pacific Hospital.

Overt Act No. 33:   On or about August 18, 2009, as part of the email chain identified in the preceding Overt Act, UCC-J emailed UCC-N explaining:

> We are going to have to continue to do the pre-ops as we have been until Dr. Brown gets [privileges] at PHLB which will take around 60 days.  So go ahead and schedule as usual [until that time.]

Overt Act No. 34:   On or about September 24, 2009, in response to repeated requests from Parker regarding the payment status of outstanding invoices in connection with the MSA between Pacific Hospital and UCTN, UCC-A forwarded a payment request email from Parker to Drobot and wrote, in part, "I am afraid we might los[e] the Federal work unless we get something to Parker next week."

Overt Act No. 35:   On or about November 18, 2009, Parker emailed Canedo, UCC-B, Hammer, UCC-I, and UCC-C, with the subject "Surgeries Performed or Scheduled through December 2009."  The email read as follows:

> Bill, The following Statistics Confirm the Surgeries Performed by Financial Class at Pacific Hospital for 2009.  We have Surgeries Scheduled through December so I have included them as well.
>
> DR [UCC-O]:          7    State Surgeries
>
>                      7    DOL Surgeries

```
                            2    Insurance Surgeries

                           16    Total Surgeries


       Dr [UCC-P]:          4    State Surgeries

                           52    DOL Surgeries

                           56    Total Surgeries


       Dr [UCC-Q]:         14    State Surgeries

                           32    DOL Surgeries

                           46    Total Surgeries


          Total's          25    State Surgeries

                           91    DOL Surgeries

                            2    Insurance

                    118    TOTAL SURGERIES 2009
```

We are interested in setting a payment schedule to clear up the
outstanding balance before the end of the year.

Overt Act No. 36:   On or about January 29, 2010, Parker sent an
email to Hammer and UCC-B, writing, in part, that Parker was
encouraging all FECA program patients who receive pain management
services to obtain such services at Pacific Hospital.

Overt Act No. 37:   On or about February 4, 2010, UCC-J emailed
defendant CARRICO and Parker, along with others at defendants
PERFORMANCE MEDICAL and ONE ACCORD, to notify them that the defendant
PERFORMANCE MEDICAL doctor designated for pre-op examinations had
been credentialed at Pacific Hospital.  UCC-J concluded: "So we

should be able to start scheduling and doing all of our own pre-ops now!"

Overt Act No. 38:   On or about May 12, 2010, Canedo sent an email to Drobot and UCC-R, with the subject "Union Choice Therapy Network--William Parker," writing, "I would [like] you gentlemen to explain to me how you believe this program works from the referrals aspect."

Overt Act No. 39:   On or about May 18, 2010, Parker and UCC-J discussed patient complaints regarding Pacific Hospital.  UCC-J stated, in part, that "[t]he general complaints that I get from most patients, is just that the hospital looks run down, old and dirty. We have had a few specific complaints, I will have to rack my brain to remember[.]"

Overt Act No. 40:   On or about August 6, 2010, defendant CARRICO emailed UCC-J, indicating that UCC-O has a chiropractic associate, "who wants to sub-lease an office at GG [Garden Grove] once a month to be a State WC PTP [primary treating physician], and refer the patients to us for therapy. . . . Please arrange with her whatever amount she pays at other facilities for the space."  UCC-J responded:

> Dr. C, Yes Dr. [UCC-O] asked me this morning if we could sublease space to her for on[e] day a month and I said I was pretty sure you would be ok with it, but he would need to ask you to be certain!!  When he said she would refer all therapy to us, I thought "no brainer"!!! :) . . .

Overt Act No. 41:   On or about October 14, 2010, UCC-M emailed defendant CARRICO and UCC-J regarding collection amounts related to UCC-O and UCC-Q, writing: "Here is a year[']s worth of collections

1   for Dr. [UCC-Q] and [UCC-O] to help you with setting up next years

2   [sic] contracts."

3   Overt Act No. 42:   On or about December 15, 2010, UCC-R sent an

4   email to Canedo, copying Drobot, with the subject "Union Choice,"

5   inquiring whether Canedo would be able to devise a system to track

6   inpatient surgical referrals from "Union Choice."

7   Overt Act No. 43:   On or about December 16, 2010, Canedo sent

8   the following email to Parker, copying UCC-F, UCC-G, and another

9   Pacific Hospital employee, with the subject "New Policy":

10          Mike Drobot has put a new policy in place regarding billing of

11          Federal Workers Comp going forward.  We'll only send you bills

12          on inpatient and outpatient hospital surgeries referred by you.

13          To do that, you have to develop a communication tool that will

14          allow our Surgery Coordination department the opportunity to

15          identify these referred surgeries when they are scheduled for

16          surgery.  The identification has to occur before the surgery and

17          not after the fact. Let me know if you have any questions.

18   Overt Act No. 44:   As part of the same email chain identified

19   in the preceding Overt Act, on or about December 17, 2010, Parker

20   sent a reply email to Canedo and Drobot.  In the email, Parker

21   identified UCC-G as the Pacific Hospital representative who UCTN

22   would contact to identify referred surgeries, and clarified that

23   Pacific Hospital "no longer want[s UCTN] to collect for patients that

24   [defendant PERFORMANCE MEDICAL did] not manage."

25   Overt Act No. 45:   On or about December 17, 2010, Parker sent

26   an email to Drobot, copying Canedo and UCC-C, writing:

27          We have managed and collected for Pacific Hospital of Long

28          Beach; 151 Surgeries in 2010- 25 State and 126 Federal.  We have

increased total surgeries by 22% (28% for Federal Patients) in 2010 compared with 2009.

The email also contained Excel spreadsheets listing surgeries performed by Performance Managed Specialty Physicians UCC-O, UCC-P, and UCC-Q.

Overt Act No. 46:   On or about January 10, 2011, a representative of defendant PERFORMANCE MEDICAL sent an email to Parker, copying defendant CARRICO, UCC-D, UCC-L, UCC-M, and others, to share Pacific Hospital monthly collection statistics for December 2010.

Overt Act No. 47:   On or about February 22, 2011, Canedo and Parker, copying Drobot, emailed each other with the subject "Hospital EOB."  Parker had inquired about five MRI billings as well as billings for an individual known to assist certain Performance Managed Specialty Physicians during surgery.  Canedo replied, "Per Mike Drobot's instructions you only get the surgeries you bring to us.  Everything else we bill ourselves since December 16, 2010."

Overt Act No. 48:   On or about March 1, 2011, a representative of defendant PERFORMANCE MEDICAL sent an email to Parker, copying defendant CARRICO, UCC-D, UCC-L, UCC-M, and others, sharing Pacific Hospital monthly collection statistics for February 2011.

Overt Act No. 49:   On or about March 7 and 8, 2011, UCC-J and UCC-N emailed each other discussing a patient who did not want to travel from Los Angeles to defendant PERFORMANCE MEDICAL's clinic in Garden Grove for a pre-op exam, citing having to take extra time off work, traveling from Los Angeles, cost of fuel, and multiple trips. UCC-J responded to UCC-N regarding the complaint and request to

schedule the pre-op at a facility closer to Los Angeles, stating the following:

> Unfortunately, we started doing our own pre-ops for one, so we
> have more control over things and can make sure everything is
> done for their pre-op and two, it's more business for us (don't
> say that to the patient).  Why don't you see if you can get
> authorization for transportation for the pre-ops?  I think that
> would be the best way to work this out.

Overt Act No. 50:   On or about April 8, 2011, Canedo emailed Drobot advising that Parker was requesting a meeting with Drobot to discuss Parker's then-ongoing relationship with Pacific Hospital.  By way of background, Canedo wrote:

> On December 16, 2010[,] when we met with William Parker we
> agreed that he would only get paid for the surgeries he refers.
> He is unhappy he isn't getting paid for other things that he
> refers and we are now billing.

Overt Act No. 51:   On or about May 14, 2011, UCC-M emailed UCC-L requesting a written reminder on "[t]he % calculation that UCTN gets [from Pacific Hospital] and the % One Accord Management gets from that amount?"

Overt Act No. 52:   On or about May 16, 2011, in response to the email identified in the preceding Overt Act, UCC-L replied to UCC-M: "UCTN gets 30%.  One Accord Management gets 20% of [what] UCTN gets."

Overt Act No. 53:   On or about June 24, 2011, UCC-G emailed Parker, UCC-L, and others, with the subject "Delay in Sending out Claims," attributing the apparent lag in Pacific Hospital sending FECA program claims to defendant ONE ACCORD for billing and collection, in part, to the fact that "[w]e had not been getting the

Performed surgery list timely [from UCTN/defendants PERFORMANCE MEDICAL and ONE ACCORD], in this case I would not always know if the claim should be sent to your office so some claims were held until I received that information."

Overt Act No. 54:   On or about July 21, 2011, Parker sent an email to Canedo, with the subject "Surgeries April-July 12, 2011," which listed surgery dates and patient names corresponding to surgeries performed by UCC-O, UCC-P, and UCC-Q.

Overt Act No. 55:   On or about September 14, 2011, UCC-N emailed written surgery instructions to Parker and another Performance Health Entity representative to review and modify.   The instructions addressed the surgery scheduling protocol for patients of UCC-O, UCC-P, and UCC-Q.   With respect to UCC-O and UCC-P, the instructions only provided for surgeries to be scheduled at Pacific Hospital.

Overt Act No. 56:   On or about September 22, 2011, Canedo sent an email to Parker, copying Drobot and UCC-I, with the subject "Payments."   In the email, Canedo specifically identified payments made to "cover all of the referred surgeries," and wrote, "[i]f you disagree that you are [ ] entitled to only being paid on the referred surgeries since December 16, 2010, Mike Drobot is the man to talk to."

Overt Act No. 57:   On or about September 29, 2011, as part of the email chain identified in the preceding Overt Act, UCC-I emailed Parker advising that Drobot had signed a check for $167,588.37 (actually issued for $167,940.32) and asked whether Parker would like the check mailed or picked up.

1    Overt Act No. 58:   As part of the email chain identified in the
2  preceding two Overt Acts, on or about September 29, 2011, Parker
3  instructed UCC-I to send the check by mail.

4    Overt Act No. 59:   On or about October 4, 2011, Parker caused
5  Pacific Hospital check number 263781, in the amount of $167,940.32,
6  to be deposited into the UCTN Bank of America account ending in 2607.

7    Overt Act No. 60:   On or about November 16, 2011, Canedo
8  emailed Parker, copying Drobot and UCC-R, with the subject "Memo of
9  Understanding." Canedo wrote, in part:

10       For all referred surgeries only[,] from September 1, 2011
11       onward, this is all we'll pay you.  We will not pay you for
12       other services these referred surgeries might have also
13       generated at the hospital.  So, for example, a referred surgery
14       from September 20 will be sent to you for collection.  We will
15       pay you your commission on the surgery when you collect it.  The
16       MRI that the patient has on September 10 will not be sent to you
17       for collection and you will not get paid when the cash comes in
18       for the MRI or other ancillary services generated by the surgery
19       patient.  Please confirm your understanding.

20    Overt Act No. 61:   On or about January 13, 2012, Parker emailed
21  Drobot and copied Canedo, writing:

22       Mr Drobot, I have forwarded to your attention two signed copies
23       (via USPS) of a new contractual agreement for Your review.  This
24       contract establishes a Management/Collection agreement between
25       Union Choice and Pacific Hospital for DOL patients beginning
26       September, 2011 for a flat monthly payment . . .

27  The contract attached to the email was a Management Services
28  Agreement between UCTN and Pacific Hospital.  The agreement stated

that Pacific Hospital shall pay UCTN $55,000 per month as a payment

for services.  The services listed in the contract included

"clerical, managerial, and administrative personnel necessary to

review for accuracy and compliance with the Department of Labor's

requirements for billings, the bills created by [Pacific Hospital.]"

Overt Act No. 62:  On or about January 19, 2012, Parker emailed

UCC-L inquiring "if [she] had any idea why our monthly collections

are the lowest in two years, Please let me know your thoughts[.]"

Overt Act No. 63:  On or about February 3, 2012, a

representative of defendant PERFORMANCE MEDICAL emailed Parker,

defendant CARRICO, UCC-M, and others, attaching an excel spreadsheet

titled "PHLB STATS JANUARY 2012.xls."

Overt Act No. 64:  On or about February 9, 2012, Canedo emailed

another Pacific Hospital employee with instructions to file the

Management Services Agreement between UCTN and Pacific Hospital in

the contract database, and for UCC-H to stop emailing payment reports

to UCTN.  Attached to the email was a copy of the Management Services

Agreement between UCTN and Pacific Hospital, for $55,000 per month,

effective September 1, 2011, bearing the signatures of Parker and

Drobot.

Overt Act No. 65:  On or about February 10, 2012, defendant

CARRICO forwarded an email to Parker with the subject "Work Comp

Central Article."  The article discussed a Wall Street Journal

"front-page story" regarding middlemen charging "inflated prices for

devices used in spinal surgeries on injured workers."  The article

stated that Randall was suspected of "conspiring to inflate the cost

of spinal-surgery hardware and use part of the proceeds to pay

kickbacks to doctors to refer workers' compensation patients for

surgeries" at a Southern California hospital.  The article said that
prior to working with this hospital, Randall worked with Drobot at
Pacific Hospital from 1998 until 2008.  The article refers to
comments from Pacific Hospital's General Counsel, stating,
"physicians at the facility have no financial motivation for
performing fusions . . . ."

Overt Act No. 66:  On or about February 21, 2012, Canedo
emailed Parker, copying Drobot, UCC-L, UCC-F, UCC-G, and UCC-R,
writing: "I notified my staff that you[']re supposed to get all of
our Federal Workers Comp to bill and collect as part of our new
agreement."

Overt Act No. 67:  On or about February 29, 2012, Parker
emailed Drobot and copied UCC-R, with the subject "Dr. [UCC-O]," and
wrote:

Mike, We are meeting with Dr [UCC-O] this Friday, March 2nd.
This will be our last chance to come to an agreement.  I am
attaching information showing a comparison of 2010 to 2011 for
Dr [UCC-O], along with his 2010 and 2011 Facility/Services
Agreement and the proposed 2012 agreement.  You will see that
the 2012 agreement is only about $200.00 more a month than 2011,
and One Accord Management is giving him 90 days to pay.

Parker then wrote:

Please note- Total Collection's, and Management/Collection fees.
You will see that there was an increase in Non-Surgical services
in 2011, although there was a slight decrease in surgeries.  Dr
[UCC-O] increased his income in 2011 by $54,721.45, although One
Accord Management did not increase their fees.  Also, FWC
[Federal Workers Compensation] new patients to Dr [UCC-O] in

44

2010 were 67 and 160 in 2011.  This will translate into more surgeries in 2012.  Dr [UCC-O] in 2010 performed 21 surgeries (17-FWC, 4-SWC [State Workers' Compensation]).  In 2011 he performed 15 surgeries (13-FWC, 4-SWC). Thank you, William.

The email included four attachments titled: "[UCC-O] Collection & Management 2010-2011.xlsx," "[UCC-O] old contract.pdf," "[UCC-O] Contract (2012).pdf," "[UCC-O] Addendum (01-31-12).pdf." The "[UCC-O] Collection & Management 2010-2011.xlsx" spreadsheet attachment noted 2010 and 2011 financial amounts in the following categories: Surgery, Collection Fee 12%, Non-Surgery, and Management & Facility Fee.  The attachment also reported financial amounts such as [UCC-O]'s "Total Collection's" [the amount that UCC-O received minus the fees paid to defendant ONE ACCORD] of $254,607.60 for 2010 and $309,329.05 in 2011 and defendant ONE ACCORD's portion of these collections under UCC-O's "Total Management Collection Fee One Accord" of $84,446.82 for 2010 and $136,574.60 for 2011.

Overt Act No. 68:   On or about February 27, 2012, UCC-M emailed defendant CARRICO and UCC-D regarding "One Accord & UCTN," writing:

A little light has been shed on [UCC-C's] remark about a voided contract as of 9/2011.  [UCC-L] found out from Pacific Hospital that the contract between [Pacific Hospital] and UCTN changed as of 9/2011.  It is no longer a % but a flat fee.  [UCC-L] has not been notified by UCTN of this and does not know the flat fee. Shal[l] I continue to use the old calculation until further notice?  Will we need to have a new contract drawn up between defendant ONE ACCORD and UCTN?

Overt Act No. 69:   On or about February 29, 2012, UCC-D replied to the email involving defendant CARRICO and UCC-M identified in the

45

1   preceding Overt Act (despite not being an initial recipient) and

2   wrote, "Please hold off on this until we talk[.]"

3       Overt Act No. 70:   Effective January 1, 2012, a Facility Rental

4   and Services Agreement between defendant ONE ACCORD and UCC-O

5   provided for UCC-L's use of defendant ONE ACCORD facilities and

6   equipment, as well as administrative and management support defendant

7   ONE ACCORD contracted to provide UCC-O.   Specifically, defendant ONE

8   ACCORD, "on behalf of [UCC-O], [was obligated to] bill patients who

9   were treated at the Facilities, including those patients who

10  subsequently undergo hospital-based surgery[.]"   The rental and

11  services fee was set at $11,572 per month.   Defendant CARRICO and

12  UCC-O signed the agreement.

13      Overt Act No. 71:   On or about March 1, 2012, UCC-L emailed

14  UCC-D stating, in part:

15      We collect **surgery only** for **our patients** for Pacific Hospital in

16      year 2011.   Now, we are collecting all Federal patients

17      including the patients [that] are not ours, MRI, CT scans and

18      [an assistant surgeon's] bills.   We have an average [of] 15

19      surgeries in a month.   I have just received 46 bills for the

20      past 1 week.   The bills still keep on coming.   The amount of

21      work is much more than before.

22      Overt Act No. 72:   On or about May 25, 2012, defendant CARRICO

23  emailed Parker, copying a retained business consultant, writing: "Hi

24  Willy, Would you please CC me any correspondence [you] have with

25  Charlie Miller [a former postal union leader]?   Thanks."   The

26  business consultant replied: "it[']s always good to coordinate

27  efforts when building a relationship – good thinking[.]"   Parker

28

1   further replied: "Yes, I am going to send a draft for your review on
2   Monday."

3       Overt Act No. 73:   On or about June 14, 2012, an email exchange
4   involving a business consultant and an accountant for defendants
5   PERFORMANCE MEDICAL and ONE ACCORD, along with UCC-M, referenced a
6   meeting involving Parker, defendant CARRICO, and UCC-D the previous
7   day and noted that defendant CARRICO asked the accountant to keep the
8   business consultant "in the loop regarding payments received from
9   Union Choice," as well as the historical payments made from UCTN to
10  defendant ONE ACCORD, documented in a spreadsheet attached to the
11  email, for the time period January 2011 through June 2012.   The email
12  also referenced that Parker and "the Carricos" are "negotiating a
13  contract amount for management services to be provided by [defendant
14  ONE ACCORD] to [UCTN]."   The email further noted that the accountant
15  (and another HR consultant) "recommend that the [pre-existing]
16  arrangement for defendant ONE ACCORD to provide management services
17  to Union Choice continue."   In response to this information, the
18  business consultant expressed confusion and wrote: "Are these the
19  payments from [U]nion [C]hoice FOR our [defendant ONE ACCORD's]
20  services?   Or [are] the payments collected FOR [UCTN] for services
21  rendered at the hospital [i.e., Pacific Hospital]."   UCC-M responded:
22  "They are one [and] the same.   Please call for more detail."

23      Overt Act No. 74:   On or about June 14, 2012, a business
24  consultant retained by defendants PERFORMANCE MEDICAL and ONE ACCORD
25  emailed defendant CARRICO, an accountant for defendants PERFORMANCE
26  MEDICAL and ONE ACCORD, and UCC-M, with the subject "Re: Union Choice
27  Therapy Network Information," writing, in part:

28

1   Ok Here is the post consultation things to do. I[']ll try to
2   piece together what I think I know and you guys do the same so
3   we can get to the bottom line.
4   William (Union Choice) has had an agreement with One Accord for
5   some time (someone fill in the time) whereby he pays One Accord
6   a ____% of what ____% he is paid by the hospital to us for
7   services rendered.  The reason I leave these areas blank is
8   while I think I know I may not. I have not seen any written
9   agreement nor been privy to any calculations based on anything
10  to do with this deal.  I only see the gross numbers of billings,
11  collections and then the fee One Accord is paid.  Do we have any
12  of these agreements in writing?  Old agreement or New one?
13  To do:
14  1. Fill in the blanks.  What is the deal?  What are the numbers
15  we are to expect from the past "agreement"?  We need to go back
16  a couple of years on this not just 2011.  Dr. C may nix that but
17  I want to know the entire amount, if possible[.]
18  2. Figure out what is owed based on point one.
19  3. Send a bill or offer a credit on the account with Union
20  Choice for the difference.
21  4. Consider the new billing amount to be a fixed amount from
22  September 2011 till now.  This fixed amount number has been
23  thrown around at $8,000.  Find out what that number actually is
24  for that period and collect that amount by a certain date.
25  5. We will need to have a letter written by [the accountant for
26  defendants PERFORMANCE MEDICAL and ONE ACCORD] co-signed by Dr.
27  C laying out these expected collections and requesting a reply
28  by a certain date of when that amount will be paid up to date.

6. Determine if this amount ($8,000 ish) is rational from an
expenses + cushion perspective and if not negotiate a new
number.

Overt Act No. 75:   On or about June 22, 2012, an accountant for
defendants PERFORMANCE MEDICAL and ONE ACCORD emailed defendant
CARRICO, UCC-M, and a business consultant retained for defendants
PERFORMANCE MEDICAL and ONE ACCORD, with the subject "More info
regarding Union Choice."   The email provided "additional historical
information regarding Union Choice," which detailed information about
defendant ONE ACCORD's total costs associated with performing the
billing and collections services for Pacific Hospital (stemming from
UCTN's MSAs with the hospital and UCTN's arrangement with defendant
ONE ACCORD) from 2005 to 2012.   The body of the email highlighted:

> Please note the high level recap in the 2005-2012 UC Collections
> Spreadsheet [attached to the email].   The recap shows the
> inception to date collections from Pacific Hospital, and the
> management fees collected by One Accord.   Over time One
> Accord['s] collection percentage is 4.3%.

The attached spreadsheet provided a year-by-year and month-by-month
breakdown, from January 2005 to May 2012, of: (1) the total collected
for Pacific Hospital by defendant ONE ACCORD (through UCTN's MSAs
with Pacific Hospital, and the agreement between UCTN and defendant
ONE ACCORD where defendant ONE ACCORD does all the actual billing and
collection work for UCTN with respect to Pacific Hospital); (2) the
management fee collected by defendant ONE ACCORD from UCTN for the
actual billing and collection services defendant ONE ACCORD did on
behalf of UCTN for Pacific Hospital (i.e., the roughly 5% to 6%
total, or 20% of the approximate 30% of collections Pacific Hospital

paid UCTN under the MSAs from 2005 to 2012); (3) defendant ONE ACCORD's cost of employee resources (i.e., labor and wages) expended to bill and collect FECA program claims for Pacific Hospital; and (4) defendant ONE ACCORD's cost of Raintree (a computer or electronic medical records software package) allocated to the task of Pacific Hospital billing and collections.  The total figures in the first two pages of the spreadsheet showed that between 2005 and May 2012 defendant ONE ACCORD (or purportedly UCTN under the MSAs) collected $15,922,106 for Pacific Hospital, while defendant ONE ACCORD was paid $689,662 for these billing and collection services (indirectly through UCTN).  According to the spreadsheet, the total cost of these services, accounting for labor and electronic software costs, was $809,410 total, or roughly 5% of the total amount (~$16 million) "collected" for Pacific Hospital.

Overt Act No. 76:   On or about July 16, 2012, Parker emailed an employee of Pacific Hospital, copying Drobot, regarding "the growing back log of surgeries for [UCC-P].  Parker further wrote, "[p]lease let me know if anything can be done. The DOL only gives 90 days of authorization. [UCC-P] is proposing taking future surgeries somewhere else."

Overt Act No. 77:   On or about August 31, 2012, a representative of defendant PERFORMANCE MEDICAL emailed defendant CARRICO, UCC-M, and others, with a subject "PHLB STATS REPORT AUGUST 2012," attaching an excel spreadsheet titled "PHLB STATS AUGUST 2012.xls."

Overt Act No. 78:   To facilitate negotiating an increase of the then-monthly kickback payment from Pacific Hospital to UCTN, on or about August 29, 2012, Parker created a Microsoft Excel spreadsheet

1 that tabulated Pacific Hospital's total surgery collections under the

2 FECA program between September 2011 and August 2012, inclusive, to

3 determine how much was paid to Pacific Hospital on a monthly basis.

4 Based on this monthly figure, Parker identified that the then-current

5 $55,000 monthly kickback Pacific Hospital paid UCTN under the

6 applicable MSA was the equivalent of 16% of the average monthly

7 amount Pacific Hospital was paid on FECA program surgeries during the

8 period ("Monthly A[v]erage $55,000 Monthly = 16%").  Parker then

9 calculated the monthly amount Pacific Hospital would need to pay UCTN

10 for a kickback of 25% of the amount Pacific Hospital was reimbursed

11 for such FECA program surgeries on average each month -- or

12 approximately $83,500 ("At 25% [=] $83,504.60").  The final row of

13 the spreadsheet reads: "New Contract: $75,000 Monthly".

14      Overt Act No. 79:   On an unknown date between August 29, 2012

15 and September 14, 2012, Parker negotiated with Drobot and Canedo for

16 a $20,000 increase in the monthly kickback payment from Pacific

17 Hospital to UCTN, such that the monthly (purportedly) fixed payment

18 increased from $55,000 to $75,000, or approximately 22% of Pacific

19 Hospital's average monthly collections over the previous twelve

20 months.

21      Overt Act No. 80:   On or about September 14, 2012, an employee

22 of Pacific Hospital emailed Canedo writing, "It seems we have this

23 agreement [referring to a marketing agreement] and a management

24 agreement in the system.  Does the new management agreement with

25 Union Choice eliminate this agreement?"  Attached to the email was a

26 marketing agreement internally dated June 1, 2004, between UCTN and

27 Pacific Hospital.  The cover page of the "Marketing Services

28 Agreement" identified UCTN and PSPM as contracting parties.  In

contrast, the introduction of the agreement, identifying the contracting parties, reflected that the intended parties were UCTN and Pacific Hospital. The "Recitals" section of the agreement stated "PACIFIC HOSPITAL desires to contract to obtain the benefit of . . . marketing services to be provided by UNION CHOICE." The "Agreement" portion of the marketing contract specified under "Services Provided by UNION CHOICE" that "UNION CHOICE shall, at its expense, provide the following marketing services: specialty marketing, advertising, and educational services." The agreement further provided for a $10,000 monthly "marketing services fee" owed to UCTN in addition to any actual pre-approved advertising-related expenses. The "Relationship of the Parties" section of the agreement states, in relevant part, that agreement does not create an employment or partnership relationship between the parties and caveats "except as provided hereinabove regarding billings and collections." Yet, the marketing agreement does not otherwise reference or discuss "billings and collections."

Overt Act No. 81:   As part of the email chain identified in the preceding Overt Act, on or about September 14, 2012, Canedo replied to the Pacific Hospital employee, writing that the original agreement "was replaced by an agreement paying $55,000 monthly starting September 1, 2011. Mike [Drobot] has a new version ready for execution upping the monthly fee to $75,000 starting September 1, 2012."

Overt Act No. 82:   On or about January 24, 2013, UCC-I emailed Parker stating that his check, "for October" had been issued and signed. UCC-I then inquired if Parker wanted the check held for him

1  to pick up.   Parker replied and requested that the check be sent

2  "ASAP."

3      Overt Act No. 83:   On or about January 24, 2013, in response to

4  the email identified in the preceding Overt Act, UCC-I replied, "Ok,

5  we will drop the check in the mail today."

6      Overt Act No. 84:   On or about January 31, 2013, as part of the

7  same email chain identified in the preceding two Overt Acts, Parker

8  replied, in part, that "we received the October check on Wednesday

9  the 30th."

10      Overt Act No. 85:   On or about January 31, 2013, a

11  representative of defendant PERFORMANCE MEDICAL emailed Parker,

12  copying defendant CARRICO, UCC-M, and others, with a subject, "PHLB

13  STATS REPORT JANUARY 2013 FINAL," attaching an Excel spreadsheet

14  titled "PHLB STATS JANUARY 2013.xls."

15      Overt Act No. 86:   On or about February 7, 2013, UCC-L emailed

16  Parker, with the subject "Dr[.] [UCC-O] Stats," writing "[p]lease see

17  attached information you requested for Dr. [UCC-O]."   A document was

18  attached to the email with charges and payments for UCC-O's patient

19  evaluations, surgeries, and prescriptions in 2012.

20      Overt Act No. 87:   On or about February 7, 2013, UCC-N emailed

21  Parker about patient A.C., writing, in part:

22      "This patient doesn't want to do his surgery at Pacific

23      Hosp[ital].   He checked the rating & 'PHLB is very low'.   He

24      said, he [had] also seen that [UCC-P] is affiliated at Cedar

25      Sinai so he wants to have the [surgery] there.   . . .

26      Overt Act No. 88:   On or about March 13, 2013, an employee of

27  Pacific Hospital emailed Parker and asked, "Were there any surgeries

28

for the month of February?"  Parker replied to the employee and copied Drobot, providing a list of referred surgeries.

Overt Act No. 89:   On or about March 26, 2013, Parker emailed UCC-I, Drobot, Canedo, and copied UCC-C and another employee of Pacific Hospital, asking if UCC-I had "confirmation that the check was sent, and the day?" in connection with UCTN's December 2012 collections invoice.

Overt Act No. 90:   On or about March 29, 2013, an internal email to multiple Pacific Hospital employees including Drobot, Canedo, and UCC-H attached a "daily Physician Payment Report."  This report included "WILLIAM PARKER-FEDERAL WORKERS COMP 25%" and listed payments of $75,000 in October, November, and December 2012 and January 2013.

Overt Act No. 91:   On or about April 30, 2013, Parker called and spoke with Hospital D Director to schedule a meeting for May 9, 2013.

Overt Act No. 92:   On or about May 10, 2013, Parker emailed Hospital D Director to share additional information about UCTN and attached a "sample contract" designated as a "Management Services Agreement," which set forth billing and collection services UCTN would provide to a contracting party, with blank spaces for the name of the entity that would contract with UCTN.  The management services fee was also blank.

Overt Act No. 93:   On or about May 10, 2013, Hospital D Director responded to the email identified in the preceding Overt Act, requesting "a payment schedule for the DOL/Federal Work Comp program that provides the reimbursement rates by DRG [Diagnosis-Related Group][.]"

1       Overt Act No. 94:   On or about May 11, 2013, Parker forwarded

2 the information request from Hospital D Director (identified in the

3 preceding Overt Act) to UCC-L, seeking the same information.

4       Overt Act No. 95:   On or about May 13, 2013, UCC-L responded

5 with the FECA program payment information Parker requested in the

6 email chain identified in the preceding two Overt Acts.

7       Overt Act No. 96:   On or about May 17, 2013, Parker forwarded

8 portions of the FECA program payment information obtained from UCC-L

9 (identified in the preceding Overt Act) to Hospital D Director, along

10 with un-redacted billing attachments containing patient and physician

11 information from actual claims previously submitted in connection

12 with surgeries at Pacific Hospital.

13       Overt Act No. 97:   On or about June 6, 2013, Parker emailed a

14 representative of defendant PERFORMANCE MEDICAL requesting that she

15 "look into the credentialing process for a [d]octor and [h]ospital."

16 Parker further specified his desire to understand "what the process

17 is, approximately how long it takes, and if [the representative had]

18 ever done it before."

19       Overt Act No. 98:   On or about June 20, 2013, UCC-N emailed

20 Parker about the cancellation of patient C.R.'s surgery earlier that

21 day at Pacific Hospital due to two of the surgery codes not being

22 authorized.  UCC-N wrote that she spoke to the patient "today," who,

23 in turn, had spoken to [UCC-Q] about performing the surgery at UCC-

24 Q's surgery center.  The patient told UCC-N that "he doesn't want to

25 go back to Pacific [Hospital]," noting that the patient said "[t]hey

26 don't know what they are doing, like they told [the patient] a

27 different time to arrive other than the time I told [the patient], so

28 if they don't know that, what else don't they know?" UCC-N further

1  explained that the patient "was already prepped w/IV on & his foot
2  was marked, & then last minute, they stopped & didn't proceed..."
3  UCC-N concluded her email asking Parker if the patient could have
4  surgery at UCC-Q's surgery center.

5      Overt Act No. 99:   On or about September 11, 2013, Parker
6  emailed Drobot, Canedo, and UCC-I to share his understanding that
7  Pacific Hospital was sold earlier that week and reminded Drobot and
8  Canedo that Pacific Hospital had "5 months of outstanding invoices"
9  under the MSA.   Parker further wrote "we also have outstanding
10 billing and collection to perform.   Please advise us of your
11 intentions and if you are cancelling our contract."

12     Overt Act No. 100:   On or about September 13, 2013, Parker
13 forwarded the email identified in the preceding Overt Act to UCC-A.
14 Parker further wrote:

15      I am in a real situation with the surgeons we work with.
16      Everyone is wanting to move the surgeries to some other
17      hospital.   Hopefully I can bring them to Molina and not create
18      more confusion.

19     Overt Act No. 101:   On or about September 23, 2013, UCC-A
20 emailed Parker, copying the Molina Executive, with the subject
21 "Federal Work Comp Program".   UCC-A introduced Parker and the Molina
22 Executive, writing:

23      By way of this email I am introducing [Molina Executive] to you
24      [Parker].   [Molina Executive] is the new CEO, hired by Molina to
25      manage PHLB hospital.   Please contact her directly to set up a
26      meeting to discuss your program.   I spoke with Mr. Molina and
27      [Molina Executive] this afternoon and they are interested in

28

1    finding out more regarding the Federal work comp program you are

2    involved with.

3    Overt Act No. 102:  On or about September 23, 2013, Parker

4    forwarded UCC-A's introduction email identified in the preceding

5    Overt Act to defendant CARRICO.

6    Overt Act No. 103:  On or about September 24, 2013, defendant

7    CARRICO responded to the email identified in the preceding Overt Act,

8    writing, "Glory!"

9    Overt Act No. 104:  On or about September 23, 2013, Parker

10   responded to the introduction email with the Molina Executive,

11   writing:

12       [Molina Executive], My name is William Parker Director of Union

13       Choice Therapy Network.  My associates and I have been providing

14       federal employees injured in the course of their employment with

15       comprehensive medical care for over 12 years.

16

17       Our program has allowed thousands of federal employees to

18       receive medical treatment that were otherwise unavailable.

19

20       I am contacting you to ask for an appointment to tell you about

21       our program and see if Molina would be interested in providing

22       surgical services to these injured federal employees.

23   Overt Act No. 105:  On or about September 23, 2013, the Molina

24   Executive responded to Parker's email identified in the preceding

25   Overt Act, suggesting a meeting date for the week of October 7, 2013.

26   In reply, on or about September 24, 2013, Parker emailed the Molina

27   Executive, copying UCC-A, confirming his availability for a meeting

28   to discuss UCTN and "our program for federal employees."  Parker also

attached defendant PERFORMANCE MEDICAL's confirmed surgery schedule for 2013, which included 2013 surgeries that had been previously performed at Pacific Hospital and future surgeries, including surgeries scheduled at facilities other than Pacific Hospital. Parker further elaborated:

> I am attaching a file that contains the Confirmed Surgery Schedule for surgeries at PHLB, they are already scheduled and pre-authorized through the end of October (please see the tabs for each Doctor's schedule on the bottom of the worksheet.)
>
> I know you are in the middle of a transition but if these patients were somehow able to have their surgeries at the appointed time it would be greatly appreciated.
>
> . . .
>
> Otherwise we will have to find them another location for the Doctor's to perform the surgeries.

Overt Act No. 106:  On or about October 1, 2013, Parker and defendant CARRICO met with Hospital C CEO and Hospital C VP at Hospital C to discuss UCTN and defendants PERFORMANCE MEDICAL and ONE ACCORD.

Overt Act No. 107:  On or about October 2, 2013, Parker emailed Hospital C CEO and Hospital C VP, copying defendant CARRICO, with the following message, in part:

> Thank you for the opportunity you afforded Dr Carrico and myself to share the history of our helping federal employees injured in the course of their employment.

1

2      We have been treating injured federal employees for over 10

3      years.

4

5      I am attaching a sample contract for your review along with

6      sample billing[s.]   The collection information below and billing

7      attachment corresponds 1 through 6 by name.   You will be able to

8      see what was billed and what was paid.

9  Parker then attached portions of voluminous un-redacted billing

10 information containing patient and physician information from actual

11 claims previously submitted in connection with surgeries at Pacific

12 Hospital.   The sample contract attached to the email – a Management

13 Services Agreement -- contained multiple blanks, including the amount

14 to be paid to UCTN.

15     Overt Act No. 108:   On or about October 2, 2013, Hospital C CEO

16 responded to Parker's email identified in the preceding Overt Act,

17 writing:

18     [Hospital C VP] and I enjoyed meeting with you, and we look

19     forward to forming a mutually beneficial relationship.   I, and

20     our attorney, will review the Agreement and attachments, and get

21     back to you soon.

22     Overt Act No. 109:   On or about October 2, 2013, Parker emailed

23 the Molina Executive to confirm that she received his prior

24 correspondence and sought "to confirm a date and time" for the

25 previously proposed meeting.   In response, on or about October 4,

26 2013, the Molina Executive responded:

27     I am appreciative of your interest in providing cases, once the

28     transaction between [Pacific Hospital] and [College Hospital]

closes.  We have been advised that requests for all non-emergent
surgeries, procedures and admissions must be resubmitted to
Molina once the transaction has closed, unless the admitting
physician certifies that such a rescheduling would result in
harm to his or her patient.  . . .  We apologize that we are
unable to make exceptions to this process.

Overt Act No. 110:  On or about October 7, 2013, UCC-G emailed
Canedo indicating that all the FECA program billings Parker and UCC-L
were requesting were mailed the prior week.

Overt Act No. 111:  On or about October 8, 2013, UCC-N forwarded
a notice from Pacific Hospital to Parker, which effectively explained
that all non-emergency surgeries and procedures scheduled with
Pacific Hospital prior to October 7, 2013 -- the closing date for the
sale of the hospital -- would be cancelled moving forward.  UCC-N
also asked Parker how she should handle "our next surgery dates: Dr
[UCC-P] 10/24/13, Dr [UCC-O] 10/29/13, Dr [UCC-Q] 11/1/13."  Based on
this email, Parker instructed staff of defendants PERFORMANCE MEDICAL
and ONE ACCORD to inquire about (a) getting College Hospital
"credentialed with ACS/DOL," (b) transferring surgery authorizations
from Pacific Hospital to College Hospital, and (c) what College
Hospital would need for UCC-O, UCC-P, and UCC-Q to perform surgeries
at College Hospital.

Overt Act No. 112:  On or about October 8, 2013, Parker emailed
the Molina Executive, copied defendant CARRICO, and forwarded the
surgery cancellation notice from College Hospital identified in the
preceding Overt Act.  Parker added:

We are interested in going forward with rescheduling surgeries
at [College Hospital] that are preauthorized at PHLB.  (Please

see our inner-office correspondence below.)  In order for us to do this we will need to know the following from [College Hospital]:

1) Who do we contact at [College Hospital] that will provide us with the necessary information needed to have [College Hospital] credentialed by ACS/DOL?

2) What is needed to credential the surgeons at CHLB in order for them to perform the surgeries there?

3) Once we have taken care of the above, we will simply reschedule at [College Hospital] all the surgeries that we already have schedule and authorized at PHLB, **with the anticipation of an ongoing contractual relationship with Molina Healthcare."** (emphasis added)

Overt Act No. 113:  On or about October 15, 2013, UCC-N emailed Parker the following message, with the subject "any news?":

Hi William, You didn't call me [with] any update so, anything? So, should I go ahead & inform patients of cancellation of 10/24 sx [surgeries]?  Because even if we book w/ [Hospital D], Yolanda doesn't think it will be next week... If you agree, I will call them tomorrow to cancel their pre-op.  Another question, how do I break it to patients?  Any words I shouldn't say? . . .

Overt Act No. 114:  On or about October 16, 2013, Parker emailed a representative of defendant PERFORMANCE MEDICAL stating, in part:

While we are in a wait and see mode with College/Molina, we are attempting to credential the specialists at [Hospital C].  This is where you come in:  Will you please call [Hospital C VP] and tell her you are calling on my behalf to find out what she needs

from the Doctors to credential them right away.  Please stay on the subject of credentialing only, if anything else comes up tell her you will ask me to call her.

Overt Act No. 115:  On or about October 16, 2013, Parker emailed the Molina Executive the following, copying UCC-A:

Hello [Molina Executive], I've been trying to contact you so I can obtain [the] status on the future of the OR [operating room] at [College Hospital].  Is there still interest and is it yet possible that [Molina Healthcare] would like to meet **to discuss bringing pre-authorized surgeries of federal injured patients to the hospital?** (emphasis added)

Overt Act No. 116:  On or about October 21, 2013, Parker emailed a family member affiliated with defendants PERFORMANCE MEDICAL and ONE ACCORD and attached a Management Services Agreement drafted for UCTN and Hospital C.  In the body of the email, Parker wrote: "Just look at the last page addendum because that's my great writing and let me know what you think!"  The agreement obligates Hospital C to pay UCTN $30,000 per month for FECA program billing and collection services.  Addendum A to the agreement provides that the $30,000 monthly fee would be phased in over the first three months of the agreement as follows: $20,000, $25,000, and $30,000.

Overt Act No. 117:  On or about October 22, 2013, Parker emailed Hospital C VP the following message, with the subject "Credentialing, ACS Enrollment, Agreement, Specialist Recommendations":

Any progress on the Agreement, Surgeon recommendations, on the credentialing requirements for the Doctors or the [DOL/]ACS enrollment.  I know you understand that the sooner we get the Doctors credentialed the sooner we can focus on scheduling the

1    surgeries.   We don't want to lose any of [the] surgeries that
2    should be scheduled at [Hospital C].
3  Hospital C VP replied within twenty minutes:
4    Yes, I would like to get going on the credentialing for your
5    surgeons.   Can I email someone the applications to start the
6    process?   Can you refresh my memory on the main outpatient
7    procedures for the generalist and spine surgeon?   Thanks, [a]nd
8    attorney and [CEO] are reviewing the contract.
9    Overt Act No. 118:   On or about October 22, 2013, Parker replied
10 to the email chain identified in the preceding Overt Act with UCC-N's
11 name and email address for the credentialing applications.   Shortly
12 thereafter, Hospital C VP replied asking for the first name of at
13 least UCC-P.   Parker responded with the full name and specialty of
14 UCC-O, UCC-P, and UCC-Q.
15   Overt Act No. 119:   On or about October 23, 2013, UCC-N received
16 an email from the Hospital C Credentials Coordinator, regarding
17 "Application Instructions."   UCC-N then shared the instructions with
18 Parker and suggested that the Performance Managed Specialty
19 Physicians would need to fill out and sign the necessary forms for
20 credentialing at Hospital C..
21   Overt Act No. 120:   On or about October 25, 2013, defendant
22 CARRICO emailed Parker seeking "any news on any hospitals?"
23   Overt Act No. 121:   On or about October 25, 2013, Parker
24 responded to defendant CARRICO's email identified in the preceding
25 Overt Act:
26   Working on getting the specialists credentialed at [Hospital C].
27   They [Hospital C] have the contract and are reviewing it.
28

I have an appointment with [Chairman] of Hospital E in Monrovia on Wednesday the 30th. It's a small 49 bed Hospital but they have a great OR and we have 3 spine surgeries already in the process of scheduling for Dr [UCC-O].

I'm hoping to hear from Dr [UCC-P] regarding a new person- the CEO at [Hospital D] to meet with.  I text[ed] him about it again today.  Just waiting on him.

I went over to the Riverside office on Wednesday and got a chance to meet Dr. [REDACTED].  .  .  .  Did you know that she is on the Ethics Board at [Hospital C]?  She said we should tell her of any Doctor recommendations they make and she will tell us how great they are.

Regarding Molina, they are in the process of getting the Hospital credentialed.  I spoke to [UCC-A] and she said it would take about 2 to 3 weeks.  She is talking to the legal department about the contract.  Still alive!

There is a person that Dr [UCC-O] recommended at [Hospital F]. They have two campuses [--] ones in downtown LA and the other is in Rosemead.  I spoke to him today and we are to speak again on Monday to check his schedule for a meeting possibly on Monday or early next week . . .

1       Overt Act No. 122:   On or about October 28, 2013, UCC-G emailed
2   UCC-L writing that "[a]ny questions regarding claims for Pacific
3   Hospital should be addressed to [UCC-F] after 10/30/13."
4       Overt Act No. 123:   On or about October 29, 2013, Parker emailed
5   Drobot and Canedo with the subject, "Outstanding Invoices" and wrote,
6   "Please contact me at your earliest convenience to settle the 7
7   months of outstanding invoices."
8       Overt Act No. 124:   On or about November 13, 2013, defendant
9   CARRICO emailed UCC-N requesting the names of patients that UCC-O
10   performed surgery on from 2011-2013.   In a reply, UCC-N attached a
11   list of the requested information, which included 15 patients in
12   2011, 29 patients in 2012, and 17 patients "so far" in 2013.
13       Overt Act No. 125:   On or about November 14, 2013, Hospital D
14   Director emailed Parker apologizing for falling out of touch and
15   asked if Parker wanted "to continue our discussions."   On the same
16   date, Parker replied, "Yes, I do[,]" and provided his telephone
17   number.
18       Overt Act No. 126:   On or about November 21, 2013, Parker
19   emailed UCC-M, writing, "I am reviewing the [Performance Managed
20   Specialty Physicians'] compensation.   If you have a copy of the three
21   specialists' compensation agreements available to email, would you
22   please email them to me?"
23       Overt Act No. 127:   On or about November 25, 2013, UCC-M emailed
24   Parker the Performance Managed Specialty Physicians' Facility Rental
25   and Services Agreements for UCC-O, UCC-P, and UCC-Q that Parker
26   requested in the email identified in the preceding Overt Act.
27       Overt Act No. 128:   On or about November 25, 2013, UCC-M also
28   emailed Parker that defendant CARRICO caused UCC-M to modify the

language of UCC-O's Facility Rental and Services Agreement, creating a new 2013 Facility Rental and Services Agreement (the "2013 Facilities Agreement") to present to UCC-O on December 2, 2013. The modified 2013 Facilities Agreement was attached to the email and reflected a reduction of the rental and services fee from the prior (2012) Facilities Agreement that UCC-O was required to pay from $11,572 to $5,876. The 2013 Facilities Agreement also did not contain a provision for a 90-day grace period on the monthly fee payment.

Overt Act No. 129:   On or about June 4, 2013, UCC-N emailed Parker and wrote:

> FYI, Dr [UCC-Q] told me about an emergency sx [surgery] he needs to do at [his surgery center]." UCC-N explained that it was a federal workers' compensation patient, but that the surgery was not authorized because the claim was not accepted yet. UCC-N continued, "Due to the severity of infection, Dr [UCC-Q] wants to proceed [with the emergency surgery], since [UCC-Q's] the one to [authorize surgeries] at that center. I hope this is alright? Please advise. Thanks[.]

Overt Act No. 130:   On or about December 10, 2013, Parker forwarded an email from UCC-L to Drobot and Canedo. In the forwarded email, UCC-L wrote Parker: "Are you able to get the above 13 missing bills or [do we] not need to work on it any more?"

COUNTS TWO THROUGH NINE

[18 U.S.C. §§ 1341, 1346, 2(b)]

49. Paragraphs 1 through 39 and 41 through 48 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

A.    THE SCHEME TO DEFRAUD

50. Beginning on a date unknown, but no later than in or about June 2004, and continuing through at least in or around December 2013, in Orange, Los Angeles, and Riverside Counties, within the Central District of California, and elsewhere, defendant CARRICO, along with Parker, the UCCs, and others known and unknown to the Grand Jury at various times between 2004 and 2013, inclusive, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud patients of defendant PERFORMANCE MEDICAL, the Performance Managed Specialty Physicians, and other co-schemer medical professionals, of their right to honest services of their physicians' performance of duties as treating physicians and medical providers by soliciting, offering, accepting, and paying kickbacks and bribes to induce the referral of patients from defendant PERFORMANCE MEDICAL to Kickback Solicited Hospitals.

B.    OPERATION OF THE SCHEME TO DEFRAUD

51. The fraudulent scheme operated, in substance, as set forth in paragraph 41 of this Indictment.

C.    USE OF THE MAILS

52. On or about the dates set forth below, within the Central District of California, and elsewhere, defendant CARRICO, Parker, the UCCs, and others, for the purpose of executing and attempting to execute the above-described scheme to defraud, willfully caused the

67

following items to be placed in a post office and authorized
depository for mail matters to be delivered by the Postal Service, as
set forth below:

| COUNT | APPROXIMATE DATE | ITEM MAILED |
|-------|------------------|-------------|
| TWO | 7/19/2012 | U.S. Treasury Check (#4030 10782498), in the amount of $264,640.73, to Health Smart Pacific Hospital ("Pacific Hospital") for reimbursement of various claims, including a FECA program reimbursement of $11,263.35 related to the hospital-billing component of the surgery performed by UCC-Q on defendant PERFORMANCE MEDICAL patient J.A., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. |
| THREE | 7/26/2012 | Claim for reimbursement from Pacific Hospital to DOL-OWCP for the hospital-billing component of the medical care provided to defendant PERFORMANCE MEDICAL patient S.V., based on defendant CARRICO and Parker facilitating, directing, and causing the referral of the patient for a surgery at Pacific Hospital, which was performed by UCC-O on or about June 5, 2012. |
| FOUR | 8/2/2012 | U.S. Treasury Check (#4030 11333894), in the amount of $302,422.45, to Pacific Hospital for reimbursement of various claims, including a FECA program reimbursement of $33,028.86 related to the hospital-billing component of the surgery performed by UCC-P on defendant PERFORMANCE MEDICAL patient R.R., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. |

| COUNT | APPROXIMATE DATE | ITEM MAILED |
|-------|------------------|-------------|
| FIVE | 10/4/2012 | U.S. Treasury Check (#4030 13649094), in the amount of $447,657.48, to Pacific Hospital for reimbursement of various claims, including a FECA program reimbursement of $54,355.28 related to the hospital-billing component of the surgery performed by UCC-O on defendant PERFORMANCE MEDICAL patient S.V., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. |
| SIX | 11/5/2012 | Claim for reimbursement from Pacific Hospital to DOL-OWCP for the hospital-billing component of the medical care provided to defendant PERFORMANCE MEDICAL patient S.G., based on defendant CARRICO and Parker facilitating, directing, and causing the referral of the patient for a surgery at Pacific Hospital, which was performed by UCC-Q on or about October 12, 2012. |
| SEVEN | 11/29/2012 | U.S. Treasury Check (#403015954315), in the amount of $186,524.72, to Pacific Hospital for reimbursement of various claims, including a FECA program reimbursement of $11,882.54 related to the hospital-billing component of the surgery performed by UCC-Q on defendant PERFORMANCE MEDICAL patient S.G., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. |
| EIGHT | 2/13/2013 | Check number 269726 from Pacific Hospital, in the amount of $75,000, payable to UCTN to induce the referral of patients of defendant PERFORMANCE MEDICAL to Pacific Hospital and tied to Pacific Hospital's FECA program reimbursements in November 2012. |

| COUNT | APPROXIMATE DATE | ITEM MAILED |
|-------|------------------|-------------|
| NINE  | 3/26/2013 | Check number 270171 from Pacific Hospital, in the amount of $75,000, payable to UCTN to induce the referral of patients of defendant PERFORMANCE MEDICAL to Pacific Hospital and tied to Pacific Hospital's FECA program reimbursements in December 2012. |

COUNTS TEN THROUGH FIFTEEN

[18 U.S.C. §§ 1343, 1346]

53.   Paragraphs 1 through 39 and 41 through 48 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

A.   THE SCHEME TO DEFRAUD

54.   Beginning on a date unknown, but no later than in or about June 2004, and continuing through at least in or around December 2013, in Orange, Los Angeles, and Riverside Counties, within the Central District of California, and elsewhere, defendant CARRICO, along with Parker, the UCCs, and others known and unknown to the Grand Jury at various times between 2004 and 2013, inclusive, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud patients of defendant PERFORMANCE MEDICAL, the Performance Managed Specialty Physicians, and other co-schemer medical professionals, of their right to honest services of their physicians' performance of duties as treating physicians and medical providers by soliciting, offering, accepting, and paying kickbacks and bribes to induce the referral of patients from defendant PERFORMANCE MEDICAL to Kickback Solicited Hospitals.

B.   OPERATION OF THE SCHEME TO DEFRAUD

55.   The fraudulent scheme operated, in substance, as set forth in paragraph 41 of this Indictment.

C.   USE OF WIRE COMMUNICATIONS

56.   On or about the following dates, within the Central District of California, and elsewhere, defendant CARRICO, Parker, the UCCs, and others, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of items

71

by means of wire communication in interstate commerce, as set forth below:

| COUNT | APPROXIMATE DATE | INTERSTATE WIRE TRANSMISSION |
|-------|------------------|------------------------------|
| TEN | 2/19/2013 | Interstate wire through Richardson, Texas and Pittsburgh, Pennsylvania in connection with effectuating a transfer of $75,000 from Pacific Hospital's East West Bank Account ending in 0545 (the "PHLB 0545 EW Bank Acct") in California to UCTN's Bank of America bank account ending in 2607 (the "UCTN 2607 BoA Acct") in California. |
| ELEVEN | 4/8/2013 | Interstate wire through Richardson, Texas and Pittsburgh, Pennsylvania in connection with effectuating a transfer of $75,000 from the PHLB 0545 EW Bank Acct in California to the UCTN 2607 BoA Acct in California. |
| TWELVE | 5/16/2013 | Interstate wire through Richardson, Texas and Pittsburgh, Pennsylvania in connection with effectuating a transfer of $75,000 from the PHLB 0545 EW Bank Acct in California to the UCTN 2607 BoA Acct in California. |
| THIRTEEN | 6/12/2013 | Interstate wire through Richardson, Texas and Pittsburgh, Pennsylvania in connection with effectuating a transfer of $75,000 from the PHLB 0545 EW Bank Acct in California to the UCTN 2607 BoA Acct in California. |
| FOURTEEN | 7/17/2013 | Interstate wire through Richardson, Texas and Pittsburgh, Pennsylvania in connection with effectuating a transfer of $75,000 from the PHLB 0545 EW Bank Acct in California to the UCTN 2607 BoA Acct in California. |

| COUNT | APPROXIMATE DATE | INTERSTATE WIRE TRANSMISSION |
|-------|------------------|------------------------------|
| FIFTEEN | 11/12/2013 | Interstate wire through Richardson, Texas and Pittsburgh, Pennsylvania in connection with effectuating a transfer of $200,000 from the PHLB 0545 EW Bank Acct in California to the UCTN 2607 BoA Acct in California. |

1    COUNTS SIXTEEN THROUGH TWENTY-ONE

2    [18 U.S.C. §§ 1952(a)(1), (a)(3); 18 U.S.C. § 2]

3    57.  Paragraphs 1 through 39, 41 through 48, 52, and 56 of this

4    Indictment, including all subparagraphs, are re-alleged and

5    incorporated by reference as if fully set forth herein.

6    58.  On or about the dates set forth below, in Orange, Los

7    Angeles, and Riverside Counties, within the Central District of

8    California, and elsewhere, defendant CARRICO used, aided and abetted

9    the use of, and willfully caused the use of, the mail and facilities

10   in interstate commerce, with the intent to distribute the proceeds

11   of, and otherwise promote, manage, establish, carry on, and

12   facilitate the promotion, management, establishment, and carrying on

13   of an unlawful activity, namely, kickbacks in violation of California

14   Business & Professions Code Section 650 and California Insurance Code

15   Section 750, and thereafter performed, attempted to perform, and

16   aided and abetted and willfully caused the performance of, an act to

17   distribute the proceeds of, to promote, manage, establish, and carry

18   on, and to facilitate the promotion, management, establishment, and

19   carrying on of such unlawful activity as follows:

20   ///

21   ///

22   ///

74

| COUNT | DATE | USE OF MAIL OR FACILITY IN INTERSTATE COMMERCE | ACTS PERFORMED THEREAFTER |
|---|---|---|---|
| SIXTEEN | 7/19/12 | Mailing of U.S. Treasury Check (#403010782498), in the amount of $264,640.73, to Pacific Hospital for reimbursement of various claims, including a FECA program reimbursement of $17,006.74 related to the hospital-billing component of the surgery performed by UCC-Q on defendant PERFORMANCE MEDICAL patient A.F., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. | On or about November 9, 2012, Pacific Hospital issued a kickback and bribe payment to UCTN, in the amount of $55,000, in connection with FECA program reimbursements to Pacific Hospital in July 2012 for services and items furnished to patients of defendant PERFORMANCE MEDICAL referred to Pacific Hospital. |
| SEVENTEEN | 9/13/12 | Mailing of U.S. Treasury Check (#403012817129), in the amount of $124,989.49, to Pacific Hospital for reimbursement of various claims, including a FECA program reimbursement of $29,909.38 related to the hospital-billing component of the surgery performed by UCC-O on defendant PERFORMANCE MEDICAL patient J.C., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. | On or about December 26, 2012, Pacific Hospital issued a kickback and bribe payment to UCTN, in the amount of $55,000, in connection with FECA program reimbursements to Pacific Hospital in September 2012 for services and items furnished to patients of defendant PERFORMANCE MEDICAL referred to Pacific Hospital. |

| COUNT | DATE | USE OF MAIL OR FACILITY IN INTERSTATE COMMERCE | ACTS PERFORMED THEREAFTER |
|-------|------|------------------------------------------------|---------------------------|
| EIGHTEEN | 9/27/12 | Mailing of U.S. Treasury Check (#403013434125), in the amount of $87,994.25, to Pacific Hospital for reimbursement of various claims, including a FECA program reimbursement of $23,097.81 related to the hospital-billing component of the surgery performed by UCC-P on defendant PERFORMANCE MEDICAL patient S.E., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. | On or about January 23, 2013, Pacific Hospital issued a kickback and bribe payment to UCTN, in the amount of $75,000, in connection with FECA program reimbursements to Pacific Hospital in September 2012 for services and items furnished to patients of defendant PERFORMANCE MEDICAL referred to Pacific Hospital. |
| NINETEEN | 11/23/12 | Mailing of U.S. Treasury Check (#403015701950), in the amount of $138,009.37, to Pacific Hospital for reimbursement of various claims, including a FECA program reimbursement of $11,903.81 related to the hospital-billing component of the surgery performed by UCC-P on defendant PERFORMANCE MEDICAL patient V.B., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. | On or about February 11, 2013, Pacific Hospital issued a kickback and bribe payment to UCTN, in the amount of $75,000, in connection with FECA program reimbursements to Pacific Hospital in November 2012 for services and items furnished to patients of defendant PERFORMANCE MEDICAL referred to Pacific Hospital. |

| COUNT | DATE | USE OF MAIL OR FACILITY IN INTERSTATE COMMERCE | ACTS PERFORMED THEREAFTER |
|---|---|---|---|
| TWENTY | 1/17/13 | Mailing of U.S. Treasury Check (#403017601467), in the amount of $97,785.16, to Pacific Hospital for reimbursement of various claims, including a FECA program reimbursement of $16,611.62 related to the hospital-billing component of the surgery performed by UCC-Q on defendant PERFORMANCE MEDICAL patient K.G., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. | On or about May 7, 2013, Pacific Hospital issued a kickback and bribe payment to UCTN, in the amount of $75,000, in connection with FECA program reimbursements to Pacific Hospital in January 2013 for services and items furnished to patients of defendant PERFORMANCE MEDICAL referred to Pacific Hospital. |
| TWENTY-ONE | 3/14/13 | Mailing of U.S. Treasury Check (#4030 19643813), in the amount of $222,487.95, to Pacific Hospital for reimbursement of various claims, including a FECA program reimbursement of $41,759.17 related to the hospital-billing component of the surgery performed by UCC-O on defendant PERFORMANCE MEDICAL patient J.P., based on defendant CARRICO and Parker facilitating, directing, and causing such referral to Pacific Hospital. | On or about June 28, 2013, Pacific Hospital issued a kickback and bribe payment to UCTN, in the amount of $75,000, in connection with FECA program reimbursements to Pacific Hospital in March 2013 for services and items furnished to patients of defendant PERFORMANCE MEDICAL referred to Pacific Hospital. |

COUNTS TWENTY-TWO THROUGH TWENTY-EIGHT

[42 U.S.C. § 1320a-7b(b)(1)(A); 18 U.S.C. § 2]

59. Paragraphs 1 through 39, 41 through 48, 52, and 56 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

60. On or about the dates set forth below, in Orange, Los Angeles, and Riverside Counties, within the Central District of California, and elsewhere, defendant CARRICO and Parker, each aiding and abetting the other, knowingly and willfully solicited and received, and willfully caused to be solicited and received, remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, the monthly billing and collections fees Pacific Hospital paid under the guise of the Management Services Agreement with UCTN, in return for referring patients of defendant PERFORMANCE MEDICAL to Pacific Hospital for the furnishing and arranging for the furnishing of items and services, that is, spinal surgeries, other types of surgeries, MRIs, pain management, and other services and items, for which payment was made in whole and in part under a Federal health care program, namely, the FECA program, as follows:

| COUNT | APPROXIMATE DATE | REMUNERATION |
|---|---|---|
| TWENTY-TWO | 11/9/2012 (posted on 11/19/2012) | Pacific Hospital check number 268665, in the amount of $55,000, payable to UCTN, for the referral of patients of defendant PERFORMANCE MEDICAL, specifically including the referral of patients J.A. and F.A., who defendant CARRICO and Parker caused UCC-Q to perform surgeries on at Pacific Hospital on or about May 25, 2012. |

| COUNT | APPROXIMATE DATE | REMUNERATION |
|---|---|---|
| TWENTY-THREE | 11/28/2012 (posted on 12/12/2012) | Pacific Hospital check number 268873, in the amount of $55,000, payable to UCTN, for the referral of patients of defendant PERFORMANCE MEDICAL to Pacific Hospital, specifically including the referral of patient R.R., who defendant CARRICO and Parker caused UCC-P to perform surgery on at Pacific Hospital on or about June 4, 2012. |
| TWENTY-FOUR | 12/26/2012 (posted on 1/7/2013) | Pacific Hospital check number 269213, in the amount of $55,000, payable to UCTN, for the referral of patients of defendant PERFORMANCE MEDICAL to Pacific Hospital, specifically including the referral of patient J.C., who defendant CARRICO and Parker caused UCC-O to perform surgery on at Pacific Hospital on or about August 14, 2012. |
| TWENTY-FIVE | 1/23/2013 (posted on 2/1/2013) | Pacific Hospital check number 269529, in the amount of $75,000, payable to UCTN, for the referral of patients of defendant PERFORMANCE MEDICAL to Pacific Hospital, specifically including the referral of patient N.N., who defendant CARRICO and Parker caused UCC-O to perform surgery on at Pacific Hospital on or about August 6, 2012. |

| COUNT | APPROXIMATE DATE | REMUNERATION |
|-------|------------------|--------------|
| TWENTY-SIX | 2/11/2013 (posted on 2/19/2013) | Pacific Hospital check number 269726, in the amount of $75,000, payable to UCTN, for the referral of patients of defendant PERFORMANCE MEDICAL to Pacific Hospital, specifically including the referral of patient E.M., who defendant CARRICO and Parker caused UCC-P to perform surgery on at Pacific Hospital on or about September 24, 2012. |
| TWENTY-SEVEN | 3/21/2013 (posting 4/8/2013) | Pacific Hospital check number 270171, in the amount of $75,000, payable to UCTN, for the referral of patients of defendant PERFORMANCE MEDICAL to Pacific Hospital, specifically including the referral of patient S.G., who defendant CARRICO and Parker caused UCC-Q to perform surgery on at Pacific Hospital on or about October 12, 2012. |
| TWENTY-EIGHT | 6/28/2013 (posting 7/17/2013) | Pacific Hospital check number 271349, in the amount of $75,000, payable to UCTN, for the referral of patients of defendant PERFORMANCE MEDICAL to Pacific Hospital, specifically including the referral of patient J.P., who defendant CARRICO and Parker caused UCC-O to perform surgery on at Pacific Hospital on or about October 16, 2012. |

COUNTS TWENTY-NINE AND THIRTY

[42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2(b)]

61.  Paragraphs 1 through 39, 41 through 48, 52, 56, 58 and 60 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

62.  On or about the dates set forth below, in Orange, Los Angeles, and Riverside Counties, within the Central District of California, and elsewhere, defendant CARRICO knowingly and willfully offered and paid, and willfully caused to be offered and paid, remuneration, indirectly and covertly, in cash and in kind, that is, the vast majority of the monthly billing and collections fees Pacific Hospital paid under the guise of the applicable Management Services Agreement with UCTN, which defendant CARRICO allowed Parker to retain -- for purportedly providing Pacific Hospital with billing and collection services, which, in fact, defendant CARRICO, through defendant ONE ACCORD, provided for a fraction of the MSA monthly fee -- to induce Parker to generate, refer, and steer injured federal employees to defendant PERFORMANCE MEDICAL, for the furnishing and arranging for the furnishing of items and services, that is, medical office services, physical therapy, durable medical equipment, and other items and services, for which payment was made in whole and in part under a Federal health care program, namely, the FECA program, as follows:

///

///

///

| COUNT | APPROXIMATE DATE | REMUNERATION |
|---|---|---|
| TWENTY-NINE | 2/11/2013 (posted on 2/19/2013) | Pacific Hospital check number 269726, payable to UCTN, in the amount of $75,000, of which Parker retained the vast majority of the proceeds as payment for the generation, referral, and steering of federal employees potentially covered under the FECA program to defendant PERFORMANCE MEDICAL, and for the subsequent referral of a subset of these patients to Pacific Hospital for hospital-based services and items that the FECA program reimbursed in November 2012. |
| THIRTY | 6/28/2013 (posted on 7/17/2013) | Pacific Hospital check number 271349, payable to UCTN, in the amount of $75,000, of which Parker retained the vast majority of the proceeds as payment for the generation, referral, and steering of federal employees potentially covered under the FECA program to defendant PERFORMANCE MEDICAL, and for the subsequent referral of a subset of these patients to Pacific Hospital for hospital-based services and items that the FECA program reimbursed in March 2013. |

COUNT THIRTY-ONE

[42 U.S.C. § 1320a-7b(b)(1)(A); 18 U.S.C. § 2]

63.  Paragraphs 1 through 39, 41 through 48, 52, 56, 58 and 60 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

64.  As set forth in Overt Act Nos. 99 to 105, 109, 112, 115, 120, and 121 of paragraph 48, in or about September 2013 and October 2013, Parker, in coordination with defendant CARRICO, communicated with UCC-A and the Molina Executive to establish a referral relationship involving UCTN, defendants PERFORMANCE MEDICAL and ONE ACCORD, and College Hospital.

65.  On or about October 8, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendant CARRICO and Parker, each aiding and abetting the other, knowingly and willfully solicited, and willfully caused to be solicited, remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, from College Hospital, in return for referring patients to College Hospital for the furnishing and arranging for the furnishing of items and services, that is, surgeries and other medical services and items, for which payment would be made in whole and in part under a Federal health care program, namely, the FECA program.

COUNT THIRTY-TWO

[42 U.S.C. § 1320a-7b(b)(1)(A); 18 U.S.C. § 2]

66.  Paragraphs 1 through 39, 41 through 48, 52, 56, 58 and 60 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

67.  As set forth in Overt Act Nos. 106 to 108, 114, and 116 to 121 of paragraph 48, in or about October 2013, defendant CARRICO and Parker, communicated with Hospital C CEO and Hospital C VP to establish a referral relationship involving defendants PERFORMANCE MEDICAL and ONE ACCORD, UCTN, and Hospital C.

68.  On or about October 1, 2013, in Riverside County, within the Central District of California, and elsewhere, defendant CARRICO and Parker, each aiding and abetting the other, knowingly and willfully solicited, and willfully caused to be solicited, remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, from Hospital C, in return for referring patients to Hospital C for the furnishing and arranging for the furnishing of items and services, that is, surgeries and other medical services and items, for which payment would be made in whole and in part under a Federal health care program, namely, the FECA program.

FORFEITURE ALLEGATION ONE

[18 U.S.C. §§ 982(a)(7), 981(a)(1)(A),

981(a)(1)(C) and 28 U.S.C. § 2461(c)]

69.   Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given to defendants CARRICO, ONE ACCORD MANAGEMENT, INC., and PERFORMANCE MEDICAL & REHAB CENTER, INC. (collectively, the "defendants") that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 982(a)(7), 981(a)(1)(A) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Count One of this Indictment.

70.   Defendants shall forfeit to the United States the following property:

a.   all right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense set forth in Count One of this Indictment;

b.   all right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment; and

c.   a sum of money equal to the total value of the property described in subparagraphs a. and b.  If more than one defendant is found guilty under Count One of this Indictment, each such defendant found guilty shall be liable for the entire amount forfeited pursuant to Count One of this Indictment.

71.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), each defendant shall

forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

```
1                         FORFEITURE ALLEGATION TWO

2        [18 U.S.C. §§ 982(a)(7), 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3             72.   Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is

4    hereby given to defendant CARRICO ("defendant") that the United

5    States will seek forfeiture as part of any sentence in accordance

6    with Title 18, United States Code, Sections 982(a)(7) and

7    981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in

8    the event of defendant's conviction under any of Counts Two through

9    Thirty-Two of this Indictment.

10            73.   Defendant shall forfeit to the United States the following

11   property:

12            a.   all right, title, and interest in any and all

13   property, real or personal, that constitutes or is derived, directly

14   or indirectly, from the gross proceeds traceable to the commission of

15   any offense set forth in any of Counts Two through Thirty-Two of this

16   Indictment; and

17            b.   a sum of money equal to the total value of the

18   property described in subparagraph a.

19            74.   Pursuant to Title 21, United States Code, Section 853(p),

20   as incorporated by Title 28, United States Code, Section 2461(c), and

21   Title 18, United States Code, Section 982(b), defendant shall forfeit

22   substitute property, up to the total value of the property described

23   in the preceding paragraph if, as a result of any act or omission of

24   defendant, the property described in the preceding paragraph, or any

25   portion thereof (a) cannot be located upon the exercise of due

26   diligence; (b) has been transferred, sold to or deposited with a

27   third party; (c) has been placed beyond the jurisdiction of the

28   Court; (d) has been substantially diminished in value; or (e) has
```

1  been commingled with other property that cannot be divided without

2  difficulty.

3

4                                        A TRUE BILL

5

6                                        /S/

7  _____
                                        Foreperson

8

9

10 TRACY L. WILKISON
   Attorney for the United States,
   Acting Under Authority Conferred
11 by 28 U.S.C. § 515

12

13 *(signature)*

14 LAWRENCE S. MIDDLETON
   Assistant United States Attorney
15 Chief, Criminal Division

16 DENNISE D. WILLETT
   Assistant United States Attorney
17 Chief, Santa Ana Branch Office

18 JOSEPH T. MCNALLY
   Assistant United States Attorney
19 Deputy Chief, Santa Ana Branch Office

20 ASHWIN JANAKIRAM
   Assistant United States Attorney
21 Major Frauds Section

22 SCOTT D. TENLEY
   Assistant United States Attorney
23 Santa Ana Branch Office

24

25

26

27

28